Jane HAWLEY; Lucille Branch; David Finley; Eileen Roberts; and William James, Plaintiffs-Appellants,

v.

CITY OF CLEVELAND; George F. Doughty, Director of Port Control; Catholic Diocese of Cleveland; Bishop Anthony M. Pilla, Defendants-Appellees.

No. 84–3458.

United States Court of Appeals, Sixth Circuit.

Argued July 9, 1985.

Decided Oct. 3, 1985.

Joshua Kancelbaum (argued), Anne W. Lindsay, Lester Potash, Cleveland, Ohio, Eliot J. Katz, Chagrin Falls, Ohio, Gordon J. Beggs, Gail White, American Civil Liberties Union of Cleveland Foundation, Inc., Cleveland, Ohio, for plaintiffs-appellants.

Edward J. Maher (argued), Robert M. Wolff (argued), Mark J. Valponi, Douglas J. Paul, Chattman, Garfield, Friedlander & Paul, Cleveland, Ohio, for defendants-appellees.

Before MARTIN and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

This is a first amendment case, involving the application of the first amendment's Establishment Clause (as made applicable to the states through the fourteenth amendment) to the leasing of space in an airport to a church for use as a chapel. Appellants, taxpayers in the City of Cleveland, filed suit in the district court seeking to enjoin such a lease by the City's Department of Port Control ("Port Control") to the Catholic Diocese of Cleveland ("the diocese"). The district court held that taxpayers lacked standing and dismissed the suit. We reverse.

I.

A.

Cleveland Hopkins International Airport is operated by the City of Cleveland through the City's Department of Port Control. The effect of the airport's finances on the City's fisc is, however, limited. Airport expenses are paid by user fees levied on the airlines which use the facility, with fees assessed in such a manner that receipts balance expenditures. If any one airline becomes unable to pay its fees, the remaining airlines' fees are increased; only in the highly unlikely event of a simultaneous default by all airlines could the City be required to devote tax revenues to airport expenses. There is, however, one manner in which airport revenues can affect municipal finances. The airlines have agreed, in order to give Port Control a motive to operate the airport efficiently, to give the City's general fund a share of non-flight related revenues, such as shop rentals. The amount of these "incentive payments can be substantial; in 1981, incentive payments to the City totaled $2,272,293. Obviously, improvident operation could result in a reduction of such payments.

In 1983, the City reached an agreement with the diocese and its bishop, the Most Reverend Anthony M. Pilla, to rent 2,733 square feet of space inside the airport terminal building for use as a chapel. The agreement was approved in a June 20, 1983 ordinance passed by Cleveland's City Council. The twenty year lease provides that the chapel will be open to persons of all faiths and be available for non-Catholic religious services, subject to scheduling by the Catholic bishop. Just how obvious the chapel's association with the Catholic Church will appear upon visual examination may be open to question. On the one hand, the chapel's exterior will conform with the airport design, and will only be identified by a simple sign saying "chapel;" signs elsewhere in the airport will indicate the location of the chapel. The chapel will have some stained glass windows in or around the exterior doors. The interior will be designed so that specifically Catholic religious symbols can be removed when the chapel is to be used by members of another faith. On the other hand, it appears that the chapel will contain at least some permanent furnishings which, if not exclusively Catholic, bespeak at least a Christian orientation and are common to Catholic places of worship (e.g., an altar, a holy water font, a statue of the Madonna).

There is some controversy as to the effect of the chapel rental on the amount of incentive payments to the City. The lease requires the diocese to pay the City rent of $1,200 a year—about 44¢ per square foot of rented space. Since the average rental rate for space in the airport terminal is approximately $20 per square foot, the chapel rental rate constitutes an apparent subsidy by the City to the diocese. There are other facts, however, which make it unclear whether this is the case. The space which the diocese is renting is located on the least used airport concourse, and is not prime rental space. The space had previously been used for storage and as a first-aid station, and no business had expressed interest in renting it. The diocese had previously offered a larger sum of money to rent space elsewhere in the airport and had been rejected, presumably because of the likelihood that Port Control would have been able to obtain still higher rents from businesses interested in that particular space. The City and the diocese contend that there was no real commercial possibility of renting the area here in question to anyone other than the diocese, and that by obtaining at least some rent for space which otherwise would have remained unrented, the City was actually improving its incentive payment status. Appellants reply that twenty years is a long time, that there is very little unrented space remaining inside the airport, and that it is very likely that the rental to the diocese will at some point have the effect of excluding tenants who would pay a higher rental. They contend as well that there may have been other parties interested in the space, noting that businesses have approached Port Control with requests to rent airport space only to be turned down. The City responds that no one else had indicated any interest in this particular space, but concedes that it made no active attempt to seek other tenants. Port Control did not solicit bids on the space.

To sum up, the operation of the airport is not subsidized by Cleveland taxes. Receipts from airport shop rentals, however, may result in increased revenues for the City. It cannot be determined on the basis of the present record whether the rental by the City to the diocese will enhance or decrease such revenues.

**B.**

Appellants are Cleveland taxpayers[1] who filed suit in the United States District Court for the Northern District of Ohio, seeking to enjoin the City and the diocese from carrying out the terms of their lease on the ground that it represents a subsidy by the City to the diocese in violation of the Establishment Clause in the first amendment, as made applicable to the states through the fourteenth amendment. The City and the diocese moved for dismissal, arguing that appellants lacked standing to bring the suit. The court granted the motion, ruling that *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) and *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952) compelled the conclusion that appellants did lack standing. Appellants then appealed to this court. Appellants raise various arguments as to why they have standing to bring the present suit.

**II.**

**A.**

The Temporary Emergency Court of Appeals recently succinctly summarized the nature of standing as follows:

To establish standing, appellants must demonstrate that they have " 'such a personal stake in the outcome of the controversy' as to warrant [their] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [their] behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In *Simon v. Eastern Kentucky Welfare Rights Organiza-*

---

**1.** Americans United for Separation of Church and State, a national organization dedicated to defending what it regards as first amendment principles of religious liberty, originally was a party to the suit. It withdrew, however, before trial.

*tion,* 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the Supreme Court stated that "the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision."

*Midwest Petroleum Co. v. United States Dept. of Energy,* 760 F.2d 287, 289 (Temp. Emer.Ct.App.1985). We first consider whether plaintiffs have asserted a sufficient personal stake in the controversy over the building of the airport chapel to warrant their invocation of the jurisdiction of the federal courts.

**B.**

■ Appellants assert that they have suffered non-economic injury as a result of the lease of space for the chapel. They allege that they "regularly use Cleveland Hopkins International Airport" and that the "presence of a sectarian chapel at Cleveland Hopkins Airport impairs [their] use and enjoyment of the public facility." Amended Complaint at ¶ 3(c).

In *Valley Forge,* plaintiffs, an organization dedicated to the separation of church and state, and several of its employees, challenged the conveyance of property by the federal government to a church-related college without any cost to the college. The Court held that plaintiffs lacked standing, either in their capacity as taxpayers or as citizens, to challenge the conveyance. The Court rejected plaintiffs' claim to general "citizen standing," which the lower court had accepted because the "challenged governmental action caused 'injury in fact' to their shared individuated right" to prevent government from violating the Establishment Clause. 454 U.S. at 476–82, 102 S.Ct. at 760–63; 619 F.2d 252, 261 (3d Cir. 1980). In discussing plaintiffs' lack of standing on the basis of non-economic injury, the Court stated that plaintiffs

> fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than

the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III. . . .

*Id.,* 454 U.S. at 485, 102 S.Ct. at 765. (Emphasis in original.) The Court further stated:

> In reaching this conclusion, we do not retreat from our earlier holdings that standing may be predicated on noneconomic injury. *See, e.g., United States v. SCRAP,* 412 U.S. [669], at 686–88, [93 S.Ct. 2405 at 2415–16, 37 L.Ed.2d 254 (1973)]; *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. [150], at 153–154 [90 S.Ct. 827 at 830, 25 L.Ed.2d 184 (1970)]. We simply cannot see that respondents have alleged an *injury* of *any* kind, economic or otherwise, sufficient to confer standing.

*Id.* at 486, 102 S.Ct. at 766. (Emphasis in original.) The Court noted that none of the plaintiffs resided within the state where the property was located, all of the plaintiffs learned of the proposed transfer through news releases, and none of the plaintiffs expressed any interest in using the property and thus could not claim their beneficial use of the property had been impaired.

A comparison of two landmark Supreme Court cases, *Sierra Club v. Morton,* 405 U.S. 727, 95 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), indicates why the non-economic injury analysis of *Valley Forge* is not a bar to standing here. In *Sierra Club* the Court rejected plaintiff's theory of standing premised upon its status as a "representative of the public." 405 U.S. at 735–36 n. 8, 92 S.Ct. at 1366 n. 8. The Court, however, indicated that allegations concerning individual members' use of the park being affected by the challenged action would be sufficient to confer standing.[2] *Id.* In *SCRAP* Washington, D.C. area plaintiffs

---

**2.** The *Sierra Club* plaintiff adopted the Court's suggestion, amended its complaint to state individualized injury, and was found to have stand-

ing. *See Sierra Club v. Morton,* 348 F.Supp. 219 (N.D.Cal.1972).

challenged a proposed railroad freight hike alleging that the increase would discourage recycling of disposable cans and bottles and therefore damage Washington area national parks which they used. The Court found plaintiffs to have standing.

In *ACLU v. Rabun County*, 698 F.2d 1098 (11th Cir.1983), *modifying*, 678 F.2d 1379 (11th Cir.1982), plaintiffs, the ACLU and five individuals, brought suit alleging that the maintenance of a large, illuminated latin cross in a Georgia state park violated the Establishment Clause. The individual plaintiffs were residents of Georgia. Only one had actually seen the cross; the others learned of the cross from anonymous phone calls and news releases. Two of the plaintiffs testified that they camped regularly, although not in the park where the cross was located. Each of the individual plaintiffs testified that they would not use the state park as long as the cross remained there, because of both its physical and metaphysical impact. The court held that although the plaintiffs' underlying motivations could "be described as either a spiritual belief or a commitment to separation of church and state," they had "demonstrated an individualized injury, other than a mere psychological reaction, which they have suffered 'as a consequence' of the challenged action." *Id.* at 1108. With regard to the two plaintiffs who testified that they were campers, the court found that they had

> sufficiently demonstrated particularized and personalized noneconomic injury to distinguish them from the general citizenry who may be as equally offended on a philosophical basis but who are not as specifically or perceptibly harmed, consistent with both the prior precedent defining noneconomic injuries in general and the decision in *Valley Forge*, to provide them with a "personal stake in the

controversy." *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). *Id.* at 1108. Thus, we view *Rabun County* as persuasive authority for the proposition that a plaintiff challenging sectarian use of public property for impairing his actual use and enjoyment of that property has standing to challenge the impermissible activity.

In the instant case, as in *SCRAP* and *Rabun*, plaintiffs claim impairment of their beneficial use of a public facility which they frequently use. Unlike the plaintiffs in *Valley Forge*, who did not reside in the state in which the transferred property was located, plaintiffs here are residents of Cleveland or Cuyahoga County and are taxpayers in the City of Cleveland; they regularly use Cleveland Hopkins International Airport. Even if they can avoid the chapel area by utilizing different concourses or stairways, this impingement on their right to use the airport is sufficient to confer standing since it would "force them to assume special burdens" to avoid "unwelcome religious exercises." *Valley Forge*, 454 U.S. at 487 n. 22, 102 S.Ct. at 766 n. 22. *See also Allen v. Hickel*,[3] 424 F.2d 944 (D.C.Cir.1970); *Birdine v. Moreland*, 579 F.Supp. 412 (N.D.Ga.1983).

**C.**

■ Appellants also claim, on two grounds, that the renting of the space for the chapel to the diocese causes them economic harm. Their first argument is that, were all of the airlines to default on their user fee obligations, they as Cleveland taxpayers would become responsible for the airport's finances. To say that imagining such a circumstance stretches credulity would be an understatement. The federal courts do not sit to resolve speculative controversies.

■ Appellants also advance a second economic basis for standing which requires

---

**3.** In *Hickel* plaintiffs challenged the placement of a nativity scene in the Ellipse, the park located across from the White House. The Government suggested that if plaintiffs did not want to look at the creche they could walk elsewhere. The court held "[p]laintiffs were entitled, as members of the public, to enjoy the park land

and its devotion to permissible public use; a government action cannot infringe that right or require them to give it up without access to the court to complain that the action is unconstitutional." 424 F.2d at 947, approvingly cited in *Rabun*, 698 F.2d at 1105.

closer analysis. They assert that the City's rental of space to the diocese for what they contend is substantially less than market value will result in loss of revenue to the City's general fund through a reduction in the size of incentive payments. If true, this allegation could give appellants standing as municipal taxpayers to defend the public treasury. As we noted above, the record does not contain sufficient facts to enable us to determine whether the rental harms the public purse, or whether it actually helps it by resulting in the rental of property which otherwise could not be rented at all. Because this is a question of fact, it must be resolved in the first instance by the trial court.

Appellees nevertheless argue that, under *Valley Forge*, appellants' status as taxpayers is insufficient to give them standing to object to the transaction. This, indeed, was the position taken by the district court. We conclude that the district court's ruling on this issue was erroneous, because that court failed to consider fully the impact of other taxpayer standing cases.

The seminal case on taxpayer standing is *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed.2d 1078 (1923), in which the Supreme Court held that federal taxpayers normally lack standing to sue to enjoin federal expenditures which they regard as unconstitutional. The Supreme Court created a limited exception to this rule in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), ruling that taxpayers can sue to enjoin congressional appropriations made pursuant to the appropriation power given Congress by article I, section 8, of the Constitution, where such appropriations violate a *specific* constitutional provision, such as the Establishment Clause. In *Valley Forge*, the Supreme Court made clear that the *Flast* exception is a narrow one. Plaintiffs in *Valley Forge* sought to enjoin, not an appropriation made by Congress pursuant to article I, section 8, but a property transfer made by the Executive Department pursuant to article IV, section 3, of the Constitution. In rejecting taxpayers' claim of standing in *Valley Forge*, the Supreme Court ruled that

taxpayers may claim standing under *Flast* only where an appropriation, as opposed to a property transfer or some other governmental act, is at issue.

The *Frothingham* Court, however, noted a distinction between the requirements of taxpayer standing in suits by federal taxpayers and suits by municipal taxpayers. For present purposes, it is a crucial one. The *Frothingham* Court indicated an intent to leave undisturbed "the rule frequently stated by this Court, that resident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation." 262 U.S. at 486, 43 S.Ct. at 601. The Court observed:

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases and is the rule of this Court. *Crampton v. Zabriskie*, 101 U.S. [(11 Otto)] 601, 609 [25 L.Ed. 1070 (1879)]. Nevertheless, there are decisions to the contrary. See, for example, *Miller v. Grandy*, 13 Mich. 540, 550. The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation.

*Id.* at 486–87, 43 S.Ct. at 601. The Supreme Court has adhered to this rule in more recent opinions. *See Doremus v. Board of Education*, 342 U.S. 429, 433–34, 72 S.Ct. 394, 396–97, 96 L.Ed. 475 (1952). In *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Supreme Court, without discussing standing, decided on the merits a suit by Pawtucket, Rhode Island taxpayers to enjoin municipal expenditures in connection with a Christmas creche. *See also Gwinn Area Community Schools v. Michigan*, 741 F.2d 840, 844 (6th Cir.1984) (" 'municipal taxpayer standing' is different from 'federal taxpayer standing.' "); *Annunziato v. New Ha-*

ven *Board of Aldermen,* 555 F.Supp. 427, 430–31 (D.Conn.1982) (*Valley Forge* does not restrict municipal taxpayer standing). Finally, we note that the Supreme Court recently affirmed the holding of this court in *Americans United for Separation of Church and State v. School District of Grand Rapids,* 718 F.2d 1389 (6th Cir. 1983), that state taxpayers have standing to challenge public aid to religious schools. *Grand Rapids School District v. Ball,* —— U.S. ——, —— n. 5, 105 S.Ct. 3216, 3221 n. 5, 87 L.Ed.2d 267 (1985). While the case is not precisely on point, it is added support for our view that the Supreme Court continues to allow suits by nonfederal taxpayers to enjoin unconstitutional acts affecting public finances.

It thus appears that a question of material fact exists as to whether the rental of the space for the chapel to the diocese at the agreed-upon price could harm Cleveland's fisc. In addition, as we noted *supra,* appellants have alleged a non-economic basis for standing. Taking appellants allegations as true, as we must at this stage of the proceeding, dismissal for lack of standing is improper.[4]

**III.**

The judgment of the district court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.[5]

---

**4.** Because we find that appellants have standing, it is not necessary for us to consider their argument that the Cleveland City Charter's authorization of taxpayer suits to enjoin illegal contracts offers an independent basis for standing. We note, in addition, that this argument adds little to the claim of standing on the basis of harm to public finances, since if the contract *is* illegal, it is because it in some way represents a subsidy by the City to the diocese.

**5.** All parties devoted considerable time on appeal to arguing as to the relative extent to which the chapel is intended for Catholic as opposed to interdenominational use. In order to save time on remand, we should observe that this question is totally irrelevant to whether the lease violates the Establishment Clause. The Establishment Clause bars aid to all religions as surely as it bars preference to any particular religion. *Grand Rapids School District v. Ball,* —— U.S. ——, ——, 105 S.Ct. 3216, 1221, 87 L.Ed.2d 267 (1985).