**George LIDDLE, et al.**

v.

**The CORPS OF ENGINEERS OF THE UNITED STATES ARMY.**

No. 3:95–0403.

United States District Court, M.D. Tennessee, Nashville Division.

Oct. 16, 1997.

Richard C. Mangelsdorf, Jr., Leitner, Williams, Dooley, and Napolitan, John Thomas Feeney, III, Feeney & Lawrence, PLLC, Nashville, TN, Henry H. Carpenter, Jr., Legal Resouces Management, Brentwood, TN, for plaintiffs.

Robert C. Watson, Office of U.S. Atty., Nashville, TN, Ann D. Navaro, Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for defendant.

## MEMORANDUM

HIGGINS, District Judge.

The Court has before it the defendant's motion (filed May 30, 1997; Docket Entry No. 45) for summary judgment, its memorandum (Docket Entry No. 46) in support, and the plaintiffs' response (filed June 18, 1997; Docket Entry No. 58). Also before the Court is the plaintiffs' motion (filed June 2, 1997; Docket Entry No. 49) for summary judgment,[1] their memorandum (Docket Entry No. 50) in support, and the defendant's response (filed June 23, 1997: Docket Entry No. 62).

The Court has subject matter over the plaintiffs' claims under 28 U.S.C. § 1331.

For the reasons discussed below, the defendant's motion for summary judgment shall be granted and the plaintiffs' motion for partial summary judgment shall be denied.

### I.

The plaintiffs filed their original petition for injunctive and declaratory relief on April 18, 1995 (Docket Entry No. 1),[2] claiming the Corps of Engineers' decision to lease a large tract of land[3] located along the shore of J. Percy Priest Lake to the Metropolitan Development and Housing Agency, which in turn subleased the land to the Young Men's Christian Association of Nashville and Middle Tennessee, violated the Flood Control Act of 1944, Corps of Engineers regulations, the National Environmental Policy Act, and the First Amendment, and created a public nuisance. The plaintiffs seek permanent and temporary injunctive relief to halt the construction and operation of a YMCA summer camp and recreational facility on the land.

---

1. As the motion deals only with the claim of violation of the Flood Control Act of 1944 and Corps regulations, the Court shall treat this as a motion for partial summary judgment.

2. The plaintiffs filed an amended petition on August 8, 1995 (Docket Entry No. 12).

3. The tract is known by the name "Smith Springs."

The Corps of Engineers manages J. Percy Priest Lake [4] and the approximately 19,000 acres of federally owned land which surround the lake in accordance with the J. Percy Priest Master Plan. The original Master Plan was prepared in 1965. After the Corps recognized that public use patterns at the lake had developed differently than anticipated, an updated Master Plan was prepared in 1986. See Administrative record (filed August 1, 1995; Docket Entry No. 9) attachment at 00012.

The 1965 J. Percy Priest Lake Master Plan describes the intended use of a variety of recreational sites which surround the lake. The Smith Springs site is described as follows:

> 15. *Site 7. Smith Springs.*— ... The site plan ... covers about 358 acres above the summer recreation pool of which some 240 acres lie above the top of the flood pool level. The initial development involves a 13 unit picnic area, boat launching ramp plus related improvements. A rather extensive tree planting program is also planned. A large camping area is proposed for future development along with the expansion of the picnic facilities. The estimated cost of the initial facilities amounts to $108,000.

*Id.* at 00001A–1b.

The 1986 Master Plan provided an updated and modified description:

> Smith Springs ... is in the midst of a rapidly developing residential area. The 1985 visitation of 182,007 attests to the fact that Smith Springs is very popular with local residents. Facilities at the site include a launch ramp, picnicking and parking facilities, and a comfort station. Original plans also proposed a large campground at Smith Springs, which was never developed.

> Due to its location in a highly populated area, and the site's large amount of unde-

veloped land, it is proposed that Smith Springs be developed and maintained as an urban park, possibly in cooperation with the Metropolitan Nashville Board of Parks and Recreation. This park will include facilities attractive to individuals and families, as well as large group areas, available by reservation and for a fee, suitable for activities such—as corporate and church picnics. These areas are designed to include all the facilities needed by the group (parking, picnic shelters, barbeque shelters, boat docks, fishing piers, playfields) in one area. In addition to being self-contained, the areas will be well separated, allowing several individual groups to have functions simultaneously without interfering with each other. Other facilities to be provided include a pavilion, band shell, beach and swimming area with water slide and other water sports, rental boats, picnic sites, and a new launch ramp. These facilities will attract families and individuals from throughout the Metropolitan area.

*Id.* at 00126–27.

In light of the recreational improvements proposed in the 1986 Master Plan, the Corps completed an environmental assessment of J. Percy Priest Lake in February, 1987, as required by the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347. The assessment analyzed the impacts associated with the Corps' operation, maintenance, and management activities at the lake, and specifically considered the expected impact of proposed additions to be made at various recreational sites. The assessment contemplated the following additions to the existing day use area at the Smith Springs site: a beach/swimming area, seventy-eight car parking spaces, a picnic shelter, two boat docking piers with eight slips, and a comfort station. The assessment further contemplated a number of additions to a proposed day use area to be added to the Smith Springs

---

4. According to the 1986 J. Percy Priest Master Plan:

> J. Percy Priest Reservoir is located in northern central Tennessee, on the Stones River, a tributary of the Cumberland River. At full recreation pool the lake covers 14,200 acres, and has 213 miles of shoreline. The lake offers a variety of recreational opportunities in-

> cluding fishing, swimming, camping, boating and hunting. The recreation areas vary from highly developed commercial operations to primitive camping areas, in response to the diverse demands of the lake's broad market area.

Administrative record (filed August 1, 1995; Docket Entry *No. 9*) attachment at 00012.

site: a two-lane launch ramp, sixty car/trailer parking spaces, 470 car parking spaces, fifteen picnic/barbeque shelters, four comfort stations, four fishing piers, a beach/swimming area, a bathhouse, a pavilion/bandshell, ten boat docking piers with forty slips, four game fields, four playgrounds, 2.7 miles of paved roads, twenty picnic sites, and a courtesy dock. *Id.* at 00348.[5]

The assessment concluded with an analysis which compared the preferred alternative—namely the continued operation, maintenance, and management of the existing lands by the Corps, with increased recreational and land use emphasis—with various other alternatives.[6] After this analysis, the Corps "found that the preferred alternative does not constitute a major Federal action having a significant effect on the environment. As a result, it is determined that an Environmental Impact Statement is not required." *Id.* at 00302–03. After reviewing the Corps' assessment of the proposed recreational improvements, the Environmental Protection Agency issued a letter stating "[f]rom the information provided, we do not anticipate any significant and/or long-term adverse environmental consequences of these actions and agree with your Agency's Finding of No Significant Impact." *Id.* at 00232.

In 1993, the YMCA approached the Corps about leasing a waterfront site on which it could operate a summer day camp. The Corps initially noted in an internal memorandum that it had concerns about leasing land for quasi-public development. *Id.* at 00374. The Corps also noted, however, that there was a need for a group camp development at the lake, and that the Master Plan for the Smith Springs site proposed many of the same uses and activities proposed by the YMCA. *Id.*

On August 16, 1993, the YMCA submitted a proposal to the Corps to lease the undeveloped portion of the Smith Springs site.[7] The proposed development included the addition of boat docks, a fishing pier, a swimming area, a barn with stables, tennis courts, a ropes course, a swimming pool, a covered open-air basketball court, an arts and crafts pavilion, athletic fields, an all-purpose camp lodge, rest room facilities, roads, parking and utilities. *Id.* at 00381–82. In order to ease the Corps' concerns about leasing to a quasi-public entity, the YMCA repeatedly emphasized that its programs were open to all, regardless of ability to pay. *Id.* at 00383, 00391.

After receiving the proposal, the Corps discussed the idea of finding a public entity to serve as the prime lessee from whom the YMCA would sublease the land. Under this arrangement, the public entity could provide oversight and ensure that the property was used for public purposes. *Id.* at 00390. Ultimately, the Metropolitan Development and Housing Agency submitted a proposal to lease the undeveloped portion of the Smith Springs site and to then sublease that land to the YMCA. *Id.* at 00398.

In reviewing the proposal from the MDHA, the Corps again expressed concerns over the potential for private exclusive use with quasi-public facilities. The Corps encouraged the MDHA to

> take an active role in managing the area, including scheduling the use of the facilities, in order to insure access for various groups other than the YMCA. A reasonable proportion of the year, including portions of the summer months, should be made available for other groups. This would both prevent private exclusive use and minimize future requests by other organizations to establish their "own" camps

---

5. This 1987 environmental assessment was over 130 pages in length and considered such issues as climate, geology and soils, hydrology, water quality, socioeconomics, biological resources (including terrestrial and aquatic resources, as well as endangered species), and current land use and trends. The assessment also included a detailed discussion of the impact of the proposed actions on the environment. *Id.* at 00231–370.

6. These alternatives included the discontinuance of operations at J. Percy Priest Lake, increased or decreased management programs, management of operations by other public bodies, and operation and management by contract.

7. A portion of the Smith Springs site was already developed and these existing uses were undisturbed by the YMCA lease. The YMCA leased the remaining undeveloped property, a tract of approximately 323 acres.

at J. Percy Priest Lake, since other organizations could be directed to the MDHA facility to serve their needs.

*Id.* at 00399.

The Corps also decided to prepare another environmental assessment to determine the possible impacts of the proposed lease and sublease of the Smith Springs site. The Corps considered three alternatives: grant the request, grant the request with modifications, or deny the request. *Id.* at 00409. A public notice was issued and comments were solicited from interested parties, including the plaintiffs.[8] The assessment discussed the environmental setting of the site; the endangered, rare, and special concern species; the cultural resources; the environmental effects of granting the request; the cultural resources effects of granting the request; and the agency's responses to the comments solicited from the public. The assessment was completed in June of 1994 and the District Engineer concluded as follows:

I have reviewed the [environmental assessment] in light of the general public interest and have determined that the granting of a lease to Metropolitan Development and Housing Agency for the purposes of developing a YMCA day camp would not constitute a major federal action significantly affecting the human environment within the meaning of the National Environmental Policy Act of 1969, as amended. Accordingly, I have concluded that an environmental impact statement covering the proposed action is not required. Further, having weighed the potential benefits that may accrue as a result of the proposed action against the reasonably foreseeable detrimental effects, I conclude that grant-

ing the lease would be in the public interest.

*Id.* at 00522.

Following the required thirty-day review period, the Corps again concluded on September 6, 1994, that the lease to the MDHA and the sublease to the YMCA "would not constitute a major federal action significantly affecting the human environment," and thus no environmental impact statement would be required. *Id.* at 00679.

An early draft of the lease to the MDHA provided for full use of the premises by the public.[9] The MDHA expressed concerns over this provision, noting that:

The YMCA camping program will be open to all age-qualified participants irrespective of ability to pay the camp fee (scholarship assistance will be provided to those needing it). However, the YMCA will need to restrict drop-in use when the day camp or other planned uses are underway. Similarly, the YMCA may make the facilities available for special events for church groups or neighborhood associations, at which time drop-in usage would also have to be restricted. About a third of the site is planned to be left as is for the use of residents in the neighborhood.[10]

*Id.* at 00571.

In response to this concern, the Corps added paragraph 37 to the lease, which provides:

Notwithstanding other conditions of the lease, specifically Condition 23. "PUBLIC USE", the lessee is authorized to develop and operate, either directly or under an approved sublease agreement, a group camp on a portion of the leased premises. The lessee or authorized sublessee's may, in connection with the operation of the group camp, implement such reasonable

---

**8.** Plaintiff George Liddle owns and resides on twelve acres of land which adjoin the Smith Springs site. Plaintiff Chatham Pointe Homeowners Association consists of members who own land and reside in the area adjoining the Smith Springs site.

**9.** The provision, paragraph 23 of the lease, provides as follows:

No attempt shall be made by the Lessee, or any of its sublessees or concessionaires, to forbid

the full use by the public of the premises and of the water areas of the project, subject, however, to the authority and responsibility of the Lessee to manage the premises and provide safety and security to the visiting public. *Id.* at 00560.

**10.** The YMCA contemplated that approximately one hundred acres would be set aside for neighborhood use. *Id.* at 00603.

restrictions as may be necessary in connection with camping activities. That portion of the leased premises not utilized as a group camp will be subject to the requirements of Condition 23. *Id.* at 00620.

The Corps and the MDHA executed a lease on September 16, 1994, which granted the MDHA a 25–year lease term in consideration for "the operation and maintenance of the premises by the Lessee for the benefit of the United States and the general public in accordance with the conditions herein set forth." *Id.* at 00606.[11] The Corps authorized the MDWA's sublease to the YMCA on December 2, 1994.

## II.

As provided by Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). In its consideration of the evidence, the Court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1349 (6th Cir.1991).

In order to prevail on a summary judgment motion, the moving party bears the burden of proving the absence of a genuine issue of material fact concerning an essential element of the opposing party's action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Davidson & Jones Dev. Co.,* 921 F.2d at 1349; *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). A dispute about the material fact must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." [12] *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the plaintiff's position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co.,* 921 F.2d at 1349. The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip. Co. v. Simon Aerials. Inc.,* 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

## III.

The plaintiffs bring four claims against the Corps: (1) violation of the Flood Control Act of 1944 and Corps regulations; (2) violation of the National Environmental Policy Act; (3) violation of the Establishment Clause of the First Amendment to the United States Constitution; and (4) violation of public nuisance laws. The defendant moves for summary judgment on each of these claims. The plaintiffs move for summary judgment only on the first claim.

---

11. The final lease contained both paragraph 23 and paragraph 37.

12. The Supreme Court further explained that a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

A. *Flood Control Act of 1944 and Corps regulations*

The plaintiffs claim that by leasing the Smith Springs site to the YMCA, the Corps acted outside the scope of authority granted to it by the Flood Control Act of 1944 and in violation of Corps regulations. The plaintiffs move for summary judgment on this claim, asserting that the Corps' actions in granting the lease were arbitrary and capricious as a matter of law. The defendants also move for summary judgment, claiming the Corps did not act outside the scope of its authority and that its interpretation of the statute and regulations was reasonable as a matter of law.

### 1. *Flood Control Act of 1944*

The Flood Control Act of 1944, 16 U.S.C. § 460d, provides the Corps with the authority to grant leases at water development projects such as J. Percy Priest Lake. Section 460d provides in pertinent part as follows:

> The Secretary of the Army is also authorized to grant leases of lands ... at water resource development projects for such periods, and upon such terms and for such purposes as he may deem reasonable in the public interest: *Provided,* That leases to nonprofit organizations for park or recreational purposes may be granted at reduced or nominal considerations in recognition of the public service to be rendered in utilizing the leased premises.... The water areas of all such projects shall be open to public use generally for boating, swimming, bathing, fishing, and other recreational purposes, and ready access to and exit from such areas along the shores of such projects shall be maintained for general public use, when such use is determined by the Secretary of the Army not to be contrary to the public interest....

*16 U.S.C.* § 460d.

According to the plaintiffs, the Corps exceeded this statutory authority when it granted a lease to the YMCA that was not in the public interest and which rendered the water areas no longer open to public use.

### 2. *Corps regulations*

The plaintiffs also claim the Corps violated its own regulations, specifically with regard to private shoreline use. The regulations provide in relevant part as follows:

**§ 327.1  Policy**

(a) It is the policy of the Secretary of the Army ... to manage the natural, cultural and developed resources of each project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources.

. . . .

(d) All water resource development projects open for public use shall be available to the public without regard to sex, race, color, creed, age, nationality or place of origin. No lessee ... providing a service to the public shall discriminate against any person because of sex, race, creed, color, age, nationality or place of origin in the conduct of the operations under the lease.

. . . .

**§ 327.30  Shoreline Management on Civil Works Projects**

. . . .

(d) *Policy*

> (1) It is the policy of the Chief of Engineers to protect and manage shorelines of all Civil Works water resource development projects under Corps jurisdiction in a manner which will promote the safe and healthful use of these shorelines by the public while maintaining environmental safeguards to ensure a quality resource for use by the public. The objectives of all management actions will be to achieve a balance between permitted private uses and resource protection for general public use. Public pedestrian access to and exit from these shorelines shall be preserved....

> (2) Private shoreline uses may be authorized in designated areas consistent with approved use allocations specified in Shoreline Management Plans. Except to honor written commitments made prior to publication of this regulation, private shoreline uses are not allowed on water resource projects where construction was initiated after December 13, 1974, or on water resource projects

where no private shoreline uses existed as of that date.

36 C.F.R. §§ 327.1, 327.30 (1996).[13] According to the plaintiffs, the Corps violated these regulations when it allowed the YMCA to undertake unauthorized private uses of the shoreline.

### 3. Standard of review

Before this Court can analyze these issues, it must first address the standard of review to be applied. The Supreme Court of the United States has provided the following guidance for courts analyzing agency interpretations of statutes and regulations:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc., v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694, 702–03 (1984) (footnotes omitted). Furthermore,

> The rule in *Chevron* makes clear that a court may not substitute its judgment for that of an agency whose action is based on a permissible construction of the statute. The court must uphold an agency's reasonable interpretation of a statute, even if there is more than one permissible statutory construction, and even if the court

would have interpreted the statute differently if the question has arisen initially in a judicial proceeding.

*Center Hill Defense Fund v. United States Army Corps of Engineers*, 886 F.Supp. 1389, 1399 (M.D.Tenn.1995) (citing *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23, 30 (1981)).

The precise questions at issue in this case are (1) whether a lease has been made "for such purposes as [the Secretary of the Army] may deem reasonable in the public interest;"[14] (2) whether the water areas of J. Percy Priest lake are "open to public use generally;"[15] and (3) whether the lease permits private shoreline uses in violation of 36 C.F.R. § 327.30 (1996). Based on the statute, the regulations, and the Court's examination of the legislative history, the Court finds Congress did not address these precise questions. Accordingly, the Court must determine whether the Corps' interpretation of the statute and regulations is based on a permissible construction. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82, 81 L.Ed.2d at 702–03.

### 4. analysis of public interest issue

■ According to the plaintiffs, paragraph 37 of the lease to the MDHA restricts the use of the Smith Springs site such that the lease is *not in the public interest*, in violation of 16 U.S.C. § 460d. The plaintiffs further contend that given the public opposition to the lease, the proposed changes cannot be considered to be in the public interest. As the Court finds the Corps' authorization of the lease to the MDHA and the sublease to the YMCA was based on a permissible construction of 16 U.S.C. § 460d, the plaintiffs' motion for summary judgment on this issue will be denied, and the defendant's motion for summary judgment on this point will be granted.

The 1986 Master Plan specifically contemplated that the Smith Springs site would "be developed and maintained as an urban park."

---

**13.** If the Corps authorizes private shoreline use, it must prepare a Shoreline Management Plan in compliance with its regulations. *See* 36 C.F.R. § 327.30 (1996).

**14.** 16 U.S.C. § 460d.

**15.** *Id.*

Administrative record (Docket Entry No. 9) attachment at 00126. The 1986 Master Plan and the 1987 environmental assessment both considered the addition of numerous picnic shelters, boat docks, fishing piers, playgrounds, as well as a water slide, a pavilion, a swimming area, and parking spaces for 470 cars. These proposed additions were specifically aimed at providing the public with increased recreational opportunities at J. Percy Priest Lake. As the YMCA's proposed uses of the Smith Springs site were essentially the same as the uses sought in the Master Plan, the Corps' conclusion that the lease to the YMCA would be in the public interest was reasonable.

Both the Corps and the YMCA worked to ensure that the lease would be in the public interest. Although the Corps had expressed concerns as to whether a lease to a quasi-public entity such as the YMCA would be in the public interest, it balanced this concern with the need for group camp development at J. Percy Priest. The Corps also requested that a public entity serve as lessee in order to prevent private exclusive use. Ultimately, as expressed in the conclusion of the 1993 environmental assessment, the Corps weighed the potential benefits against the reasonably foreseeable detrimental effects of the lease and determined that granting the lease would be in the public interest.[16]

The YMCA also worked to alleviate concerns about whether the lease would be in the public interest. The YMCA continually reiterated that the summer camp and all other YMCA programs were open to members and nonmembers, regardless of ability to pay.[17] In addition, the YMCA set aside one hundred acres of undeveloped land for use by the neighborhood residents.

Paragraph 37 of the MDHA lease does allow the YMCA to restrict access to and use of the Smith Springs site, but the lease also

requires that such restrictions be reasonable. At times, the YMCA will need to limit access to campers, program participants, or groups who have reserved use of the area; these reasonable restrictions are a necessary part of any group camp. Such restrictions do not create exclusive private use of the land, they merely serve to facilitate the land's intended use as a group camp development.

Finally, the Court notes that the Corps has authorized a number of different types of public recreational uses at J. Percy Priest Lake, including several privately owned commercial marinas, which the Corps found to be in the public interest. Furthermore, the Corps has leased land to other YMCA organizations for the purpose of operating outdoor centers and day camps, and such leases have not been found to be against the public interest.[18]

For all of these reasons, the Court finds the Corps reasonably interpreted the Flood Control Act to find that the lease to the YMCA was made "for purposes as [the Secretary of the Army] may deem reasonable in the public interest." 16 U.S.C. § 460d. The Court rejects the plaintiffs' contention that simply because there was public opposition to the lease, the lease cannot be considered to be in the public interest.

### 5. *analysis of public use of water areas issue*

■ The plaintiffs also contend that as a result of the lease to the YMCA, the affected water areas are no longer open for public use, in violation of 16 U.S.C. § 460d. The Court finds the Corps reasonably interpreted the Flood Control Act to conclude that the water areas of J. Percy Priest remain "open to public use generally," *id.*, and thus the plaintiffs' motion for summary judgment on this issue will be denied and the defendant's

---

**16.** In addition, the Court notes that the Corps granted the MDHA a lease in consideration for "the operation and maintenance of the premises by the Lessee for the benefit of the United States and the general public in accordance with the conditions herein set forth." Administrative record (Docket Entry No. 9) attachment at 00606.

**17.** Those who can afford to pay a program fee are asked to do so in order to defray expenses,

and scholarships are available for those needing financial assistance. Defendant's memorandum in support (Docket Entry No. 46) exhibit 2 at 2–3.

**18.** For example, the Corps leased land to a Georgia YMCA for the Cherokee Outdoor Center on Lake Allatoona. Defendant's memorandum in support (Docket Entry No. 46) exhibit 2 at 2.

motion for summary judgment will be granted.

Although access to the water areas of the leased land will be more restricted, the public will continue to enjoy access to those areas, albeit through the YMCA's programs.[19] As explained above, paragraph 37 only allows the YMCA to impose reasonable restrictions, such as limiting access to campers, program participants, or groups who have reserved use of the area. These restrictions are reasonable and serve to facilitate the intended use of the water areas. Just because the water areas are no longer open to unrestricted public use does not mean the water areas are closed to public use. The Court finds the Corps' conclusion that the water areas "remain open to public use generally" was based on a permissible construction of the Flood Control Act.

6. *analysis of private shoreline uses issue*

■ Finally, the plaintiffs contend that the lease to the YMCA creates private shorelines uses in violation of 36 C.F.R. § 327.30 (1996). The Court finds the Corps' interpretation of the regulation to be reasonable, and thus the plaintiffs' motion for summary judgment on this issue will be denied, and the defendant's motion for summary judgment will be granted.

As explained in section III.A.5, the public retains access to the shoreline along the leased land, albeit limited by any reasonable restrictions imposed by the YMCA. Furthermore, as private shoreline uses have not been created, the Corps was not required to comply with the regulations requiring a Shoreline Management Plan. The Court finds the Corps's conclusion that private shoreline use was not created was based on a permissible construction of 36 C.F.R. § 327.30.

In summary, the Court finds the Corps' interpretation of both the Flood Control Act and Corps regulations was reasonable. While the plaintiffs' interpretation may also. be reasonable, "the court must uphold an agency's reasonable interpretation of a statute." *Center Hill Defense Fund*, 886 F.Supp. at 1399 (citation omitted). Accord-

ingly, the defendant's motion for summary judgment on this claim will be granted and the plaintiff's motion for partial summary judgment will be denied.

B. *National Environmental Protection Act*

The plaintiffs also claim that the Corps' decision not to prepare an environmental impact statement (EIS) violated the National Environmental Policy Act. According to the plaintiffs, the environmental assessment (EA) conducted by the Corps in 1994 was not in compliance with NEPA and the finding of no significant impact was erroneous. The defendant moves for summary judgment, claiming it acted in full compliance with NEPA.

NEPA requires that all federal agencies prepare an environmental impact statement before approving any major action that will significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). To determine whether the effect on the environment will be significant enough to warrant an EIS, agencies must first prepare an environmental assessment. 40 C.F.R. § 1501.4(b)–(c) (1996). "If the EA finds that there are significant effects, an Environmental Impact Statement ("EIS") must be prepared; otherwise a Finding of No Significant Impact ('FONSI') is issued." *Ass'n of Significantly Impacted Neighbors v. City of Livonia*, 765 F.Supp. 389, 392 (E.D.Mich.1991).

Courts will overturn an agency's decision that no EIS is required only if such a decision is arbitrary, capricious, or an abuse of discretion. *Crounse Corp. v. Interstate Commerce Comm'n*, 781 F.2d 1176, 1193 (6th Cir.), *cert. denied*, 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264, and *cert. denied*, 479 U.S. 890, 107 S.Ct. 291, 93 L.Ed.2d 264 (1986). The Supreme Court has explained that:

> It is not for us to substitute our judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue. It is our role, however, to determine whether the agency has, in fact, adequately studied the

---

**19.** In addition, the public continues to enjoy access to the water areas in the existing development at Smith Springs which were not affected by the lease.

issue and taken a "hard look" at the environmental consequences of its decision.

*Id.* (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576, 590 n. 21 (1976)). Stated another way, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437, 447 (1983) (citations omitted)).

■ When reviewing an agency's decision not to issue an EIS, the Court is governed by the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and should focus on two factors: (1) whether the agency's decision was arbitrary and capricious, as defined in 5 U.S.C. § 706; and (2) whether the agency took a hard look at the environmental consequences of the project in question, pursuant to the Council of Environmental Quality (CEQ) regulations, 40 C.F.R. Pt. 1508. *Friends of Fiery Gizzard v. Farmers Home Admin.,* 864 F.Supp. 717, 718–19 (M.D.Tenn.1994), *aff'd,* 61 F.3d 501 (1995).

■ With regard to whether an agency's decision was arbitrary and capricious, the court " 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.' " *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377, 395 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136, 153 (1971).)

■ With regard to whether the agency took a hard look at the environmental consequences, the Court must examine whether the Corps considered the relevant factors set forth in the CEQ regulations. The regulations explain that in order to determine whether a federal action will "significantly" affect the environment, the agency must consider both the context and the intensity of the action. 40 C.F.R. § 1508.27 (1996). The regulations provide ten factors to consider when determining the intensity of an action:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or re-

quirements imposed for the protection of the environment.

40 C.F.R. § 1508.27.

■ As required under NEPA, the Corps conducted an EA in 1994 in order to study the effect of the YMCA lease on the environment. While a comprehensive EA conducted in 1987 had studied the effect of all of the additions proposed in the 1966 Master Plan, the 1994 EA focused specifically on the proposed lease of the Smith Springs site to the YMCA. As required by the regulations, the EA discussed the beneficial and adverse impacts of the action, the effect on public health or safety, the effect on the surrounding cultural and historic resources, the agency's response to the public's comments about the lease, the effects on the surrounding flora and fauna, the potential impact on areas eligible for listing in the National Register of Historic Places, and the effect on any endangered or critical species. *See* administrative record (Docket Entry No. 9) attachment at 00497–00545.

The Court finds the Corps considered the relevant CEQ regulations and took a hard look at the environmental consequences of the proposed lease to the YMCA. *Crounse*, 781 F.2d at 1193. Furthermore, as the Corps considered the relevant factors and disclosed the environmental impact of the proposed lease, its finding of no significant impact was not arbitrary and capricious. *Baltimore Gas*, 462 U.S. at 97–98, 103 S.Ct. at 2252, 76 L.Ed.2d at 447. Accordingly, the defendant's motion for summary judgment will be granted as to this claim.

### C. *Establishment Clause*

■ The plaintiffs claim the Corps violated the First Amendment by granting a lease to a Christian organization. The defendant moves for summary judgment, claiming the plaintiffs lack standing on this issue. The Court agrees with the defendant.

In order to have standing, a plaintiff must allege (1) that he personally suffered an actual or threatened injury; (2) which is traceable to the challenged action; and (3) which is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State,*

454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700, 709 (1982) (citations omitted). With regard to the first element, the *Valley Forge* Court explained that although the injury need not be economic, mere psychological injury is insufficient to confer standing. *Id.* at 485–86, 102 S.Ct. at 765–66, 70 L.Ed.2d at 718. Instead, there must be a showing that the plaintiffs "were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them." *Id.* at 487 n. 22, 102 S.Ct. at 767 n. 22, 70 L.Ed.2d 718–19 n. 22.

The United States Court of Appeals for the Sixth Circuit followed this "special burdens" test in *Hawley v. City of Cleveland,* 773 F.2d 736, 737 (6th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986). In *Hawley,* the city leased space in the Cleveland airport to a church for use as a chapel. The Court found the plaintiffs had suffered actual injury sufficient to confer standing because they regularly used the airport and were forced to alter their use of the airport in order to avoid the chapel area. The Court explained that such impaired use amounted to an actual injury because the plaintiffs were forced " 'to assume special burdens' to avoid 'unwelcome religious exercises.' " *Id.* at 740 (quoting *Valley Forge,* 454 U.S. at 487 n. 22, 102 S.Ct. at 766 n. 22, 70 L.Ed.2d at 718–719 n. 22.)

In a more recent case, the Sixth Circuit held "[t]he use of governmental authority to encourage a sectarian religious view is a sufficient injury if directed toward the plaintiff." *Washegesic v. Bloomingdale Public Schools,* 33 F.3d 679, 682 (6th Cir.1994), *cert. denied,* 514 U.S. 1095, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995). In *Washegesic,* the Court found a student had standing to challenge the display of a portrait of Jesus Christ hanging in the hallway of a public high school because he had continuing direct contact with the portrait. *Id.* at 682–83. *See also, Murray v. City of Austin,* 947 F.2d 147, 151 (5th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992) (finding that citizen exposed to city insignia which contained cross had standing); *ACLU v. Rabun County,* 698 F.2d 1098, 1103 (11th Cir. 1983) (finding plaintiffs who used a Georgia

state park had standing to challenge the maintenance of a large, illuminated cross); *Harvey v. Cobb County,* 811 F.Supp. 669. 674 (N.D.Ga.1993), *aff'd without opinion,* 15 F.3d 1097 (11th Cir.), *cert. denied,* 511 U.S. 1129, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994) (finding that lawyer who had regular, unwelcome, direct contact with Ten Commandments posted in courthouse had standing).

In *Freedom From Religion Foundation, Inc. v. Zielke,* 845 F.2d 1463, 1468 (7th Cir. 1988), the Seventh Circuit found the plaintiffs did not have standing to challenge a monument of the Ten Commandments displayed in a city park because they "did not alter their behavior in any manner as a result of the Ten Commandments monument." The Court also rejected the argument that a plaintiff had standing simply because of her proximity to the monument, stating that the plaintiff had not demonstrated that she lived near the park or that "the monument is visible in the course of her normal routine, or that her usual driving or walking routes take her past the park." *Id.* at 1468–69.

Despite the proximity of the plaintiffs in the current action to the Smith Springs site, the Court finds they have not established that they were subjected to unwelcome religious exercises or displays, or that they were forced to assume special burdens in order to avoid confronting such exercises or displays. *Valley Forge,* 454 U.S. at 487 n. 22, 102 S.Ct. at 766 n. 22, 70 L.Ed.2d at 718–719 n. 22. Unlike *Hawley* or *Washegesic* or the other cases cited above where the courts found the plaintiffs had been injured because they had to avoid some sort of sectarian display or

exercise, the plaintiffs in the current action have not alleged any sort of display or exercise at all. At present, there is no chapel, nativity scene, menorah, monument of the Ten Commandments, Bible study, revival, or prayer meeting to avoid. As such, the plaintiffs cannot claim they have been forced to assume a special burden in order to avoid such a display or exercise.[20] Accordingly, the plaintiffs have not established an injury sufficient to confer standing.[21]

The Court finds no justiciable case or controversy over which it may exercise jurisdiction, thus it must dismiss the plaintiffs' claim of violation of the Establishment Clause.

### D. *Public Nuisance*

■ Finally, the plaintiffs claim the use of the Smith Springs site by the YMCA will create and constitute a public nuisance due to the increased traffic flow, noise, and pollution effects. The defendant moves for summary judgment, claiming the plaintiffs lack standing. The Court agrees and finds the plaintiffs lack standing to bring a public nuisance claim.

■ A private individual has standing to claim a public nuisance when he or she alleges some special or peculiar injury which is not shared by the general public. *See Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 315 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *Fox v. Corbitt,* 137 Tenn. 466, 194 S.W. 88 (1917). According to the plaintiffs, they suffer a special injury because of their proximity to the traffic, noise, and pollution caused by the YMCA's use of the Smith Springs site.

**20.** If such a display were erected in the future, or such an unwelcome exercise occurred in the future, the plaintiffs might then have standing to claim violation of the Establishment Clause. Until that time, however, the issue is not ripe for adjudication.

**21.** The Court additionally notes that even if found the YMCA lease did violate the Establishment Clause, the plaintiffs' injury would not necessarily be redressed by an injunction prohibiting the development of the YMCA camp. The plaintiffs allege that they have a cognizable injury because "the granting of the lease, which violates the Establishment Clause, will impair Plaintiffs' previously unimpaired use and enjoyment of a public area." Plaintiffs' response (Docket Entry No. 58). This alleged injury does not seem to be necessarily related to any alleged violation of the

Establishment Clause. Just because the plaintiffs currently enjoy unrestricted and unimpaired access to and use of the Smith Springs site does not mean that they have a right to continued unrestricted access and use. Even if the concept of a YMCA day camp at the site had never been proposed, the Corps could have leased the site to a public entity like the Parks and Recreation Department for the purpose of operating a similar group camp. Given that the YMCA's proposed uses for the Smith Springs site are very similar to the uses contemplated by both the 1965 and the 1987 Master Plan, any lease in furtherance of the Master Plan would impair the plaintiffs' access and use in exactly the same manner as the YMCA lease, without any violation of the Establishment Clause.

The Court finds the plaintiffs suffered no unique injury, thus they lack standing to sue for public nuisance. As there is no justiciable controversy over which the Court may exercise jurisdiction, the plaintiffs' public nuisance claim will be dismissed.

### IV.

On the claim of violation of the Flood Control Act and Corps regulations, the Court will grant the defendant's motion for summary judgment and will deny the plaintiffs' motion for partial summary judgment. The Court will also grant the defendant's motion for summary judgment with regard to the plaintiffs' NEPA claim, Establishment Clause claim, and public nuisance claim

An appropriate order will be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the defendant's motion (filed May 30, 1997; Docket Entry No. 45) for summary judgment is granted. The plaintiffs' motion (filed June 2, 1997; Docket Entry No. 49) for partial summary judgment is denied. Accordingly, this action is dismissed with prejudice.

Entry of this order shall constitute the judgment in the case.

It is so ORDERED.