RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0224P (6th Cir.)
File Name: 04a0224p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

AMERICAN CIVIL LIBERTIES
UNION OF OHIO FOUNDATION,
INC.,

    *Plaintiff-Appellee,*

*v.*

ROBERT ASHBROOK, Sued
Here in His Official Capacity
as Richland County
Commissioner,

    *Defendant,*

JAMES DEWEESE, Hon., Sued
Here in His Official Capacity
as a Judge of the Richland
County Court of Common
Pleas,

    *Defendant-Appellant.*

No. 02-3667

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00556—Kathleen McDonald O'Malley,
District Judge.

Argued: October 31, 2003

Decided and Filed: July 14, 2004

Before: BATCHELDER and COLE, Circuit Judges;
HOOD, District Judge.[*]

———————

### COUNSEL

**ARGUED:** Francis J. Manion, AMERICAN CENTER FOR
LAW AND JUSTICE, New Hope, Kentucky, for Appellant.
Raymond Vasvari, AMERICAN CIVIL LIBERTIES UNION
OF OHIO FOUNDATION, Cleveland, Ohio, for Appellee.
**ON BRIEF:** Francis J. Manion, AMERICAN CENTER
FOR LAW AND JUSTICE, New Hope, Kentucky, for
Appellant. Raymond Vasvari, AMERICAN CIVIL
LIBERTIES UNION OF OHIO FOUNDATION, Cleveland,
Ohio, for Appellee. David R. Langdon, LAW OFFICE OF
DAVID R. LANGDON, Cincinnati, Ohio, for Amicus Curiae.

    HOOD, D. J., delivered the opinion of the court, in which
COLE, J., joined. BATCHELDER, J. (pp. 19-42), delivered
a separate dissenting opinion.

———————

### OPINION

———————

    HOOD, District Judge. Defendant, a judge in the General
Division of the Court of Common Pleas in Richland County,
Ohio, appeals the district court's order granting Plaintiff's
motion for partial summary judgment and denying summary
judgment for Defendant on the issue of whether his courtroom

———————

    [*] The Honorable Joseph M. Hood, United States District Judge for the
Eastern District of Kentucky, sitting by designation.

display of the Ten Commandments violated the Establishment Clause of the First Amendment. For the reasons set forth below, we **AFFIRM** the decision of the district court.

## I.  BACKGROUND

In July 2000, James DeWeese, the elected judge of the General Division of the Court of Common Pleas in Richland County, Ohio, hung a poster of the Ten Commandments in a gilded frame on the wall of his courtroom, Courtroom Number One. The poster hung on a side wall of the courtroom, near the front of the audience section. Directly opposite and across the gallery from the poster of the Ten Commandments, he hung a similarly styled and framed poster of the Bill of Rights.

DeWeese had created both of these posters on his computer and had them enlarged and framed at a local framing store, all at his personal expense. The style of the posters is identical. At the top, in the largest size print on the page, are the words "the rule of law." Next, in smaller-sized and all-capital typeface, one poster bears the words "THE TEN COMMANDMENTS." In identical typeface, the other poster bears the words "BILL OF RIGHTS." Finally, each poster contains the text of the relevant documents.[1] No captions or

---

[1]The text of the Ten Commandments hanging in his courtroom reads as follows:

I.      Thou shalt have no other gods before me.

II.     Thou shalt not make unto thee any graven image. Thou shalt not bow down thyself to them, nor serve them for I the LORD thy God am a jealous God.

III.    Thou shalt not take the name of the LORD they God in vain; for the LORD will not hold him guiltless that taketh his name in vain.

plaques accompany these posters to describe or explain their purpose or to tie either of the posters together into a unified display with one another or any other items displayed in the courtroom or in the vicinity of the courtroom.

Also in the courtroom are three posters featuring portraits of and quotations from Thomas Jefferson, James Madison, and Alexander Hamilton concerning the virtues of the jury trial system. The posters were hung on the rear wall of the courtroom in 1993. Above the jury box hangs a portrait of Abraham Lincoln already present in the courtroom when DeWeese came onto the bench in 1991. On the front wall hangs the seal and the motto of the State of Ohio, "With God All Things Are Possible." These items were placed in the courtroom in 1991 or 1992.

---

IV.     Remember the sabbath day, to keep it holy. Six days thou shalt labor, and do all thy work. But the seventh day is the sabbath of the LORD thy God: in it thou shalt not do any work.

V.      Honor thy father and thy mother: that thy days may be long upon the land which the LORD God giveth thee.

VI.     Thou shalt not kill.

VII.    Thou shalt not commit adultery.

VIII.   Thou shalt not steal.

IX.     Thou shalt not bear false witness against thy neighbor.

X.      Thou shalt not covet thy neighbor's house, thou shalt not cove thy neighbor's wife, nor his manservant, nor his maidservant, nor his ox, nor his ass, nor anything that is thy neighbor's.

DeWeese's courtroom is located on the third floor of the Richland County Courthouse and shares a lobby area with the three other courtrooms located on that floor. On the third floor, there are also several elevators, stairwells, offices, and restrooms. There are two displays in the lobby area. The first, the "Freedom Shrine," is a display of twenty-nine reproductions of historical documents arranged and donated by the National Exchange Club. The historical documents include the Mayflower Compact, presidential inaugural speeches, and the text of the "Star Spangled Banner," and were chosen to memorialize the founding of the country and subsequent moments of historical import. The display was hung sometime in the 1980s. There is also a separate poster containing the portraits of nine historical figures and quotations regarding the history of the jury system.

Plaintiff-Appellee American Civil Liberties Union of Ohio Foundation, Inc. ("ACLU-Ohio"), brought this action on behalf of members in Richland County, Ohio, against DeWeese and the Commissioners of Richland County, Ohio, all in their official capacities.[2] ACLU-Ohio asserted that the hanging and continued display of the Ten Commandments violated the Establishment Clause of the First Amendment to the United States Constitution and Article I, § 7, of the Ohio Constitution. ACLU-Ohio requested a permanent injunction and order directing removal of the Ten Commandments poster. The district court granted ACLU-Ohio's motion for partial summary judgment against DeWeese, denied Defendants' cross-motion for summary judgment, and ordered DeWeese to remove the poster immediately. This appeal followed.

---

[2]The County Commissioners were not the subject of the district court's order granting Plaintiff's motion for partial summary judgment and denying Defendant DeWeese's motion for summary judgment and are not parties to this appeal.

## II.  STANDARD OF REVIEW

We review district court orders granting summary judgment *de novo*. *Black v. Roadway Express, Inc.*, 297 F.3d 445, 448 (6th Cir. 2002). More to the point, it is taught that:

> ...in reviewing a district court's grant of a permanent injunction, we review the district court's conclusions of law and its findings of constitutional, or ultimate, facts *de novo. See Grutter v. Bollinger,* 288 F.3d 732, 743 (6th Cir.2002). We review the district court's findings of subsidiary facts for clear error. *Deja Vu v. Metro. Gov't of Nashville,* 274 F.3d 377, 389 (6th Cir. 2001).

*Adland v. Russ*, 307 F.3d 471, 477 (6th Cir. 2002)**.**

## III.  DISCUSSION

### A.  STANDING

Standing to sue requires an individual to demonstrate (1) actual or threatened injury which is (2) fairly traceable to the challenged action and (3) a substantial likelihood the relief requested will redress or prevent the plaintiff's injury. *Adland*, 307 F.3d at 477-78. A voluntary membership organization has standing to sue on behalf of its members "when (a) its members otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm.,* 432 U.S. 333, 343 (1977); *Adland*, 307 F.3d at 478. Thus, in *Adland*, the court found standing where individual plaintiffs frequently traveled to the Kentucky State Capitol to engage in political advocacy for a variety of organizations and would endure direct and unwelcome contact as a result of legislation proposing erection of a

proposed Ten Commandments monument there.[3]  *Adland*,

---

[3]Unlike Judge Batchelder, we do not take the Supreme Court's decision in *Valley Forge Christian College v. Americans United for the Separation of Church and State* to stand for the proposition that psychological injury can *never* be a sufficient basis for the conferral of Article III standing.  *See Valley Forge Christian College v. Americans United for the Separation of Church and State*, 454 U.S. 464 (1982).  In that case, the Supreme Court held that the individuals in whose name the organization brought suit had failed to establish that they had actually been injured by the Department of Education's decision to transfer some of its surplus land to a private, Christian college, operating under the auspices of the Assemblies of God Church.  Although the Supreme Court explicitly stated that injuries that merely amount to "the psychological consequence presumably produced by observation of conduct with which one disagrees" are insufficient to confer standing under Article III, we believe that this statement cannot be read without taking the particular circumstances of that case into account.  In fact, the Supreme Court's decision that the *Valley Forge* plaintiffs lacked standing because its members had suffered no direct injury was based, in large part, on the fact that although the property transfer occurred in Chester County, Pennsylvania, while the named plaintiffs resided in Maryland and Virginia and "learned of the transfer through a news release." *Id*. at 487.

Accordingly, this circuit and other circuits have read *Valley Forge*'s language as depending in no small part on the directness of the harm alleged.  Thus, in *Washegesic v. Bloomingdale Public Schools*, the court held that a former student had standing to challenge a school's hanging of a picture of Jesus in the school's hallway. *Washegesic v. Bloomingdale Public Schools*, 33 F.3d 679, 682-83 (6th Cir. 1994).  There, the court found that the matter was distinguishable from *Valley Forge* because of the plaintiff's "continuing direct contact with the object at issue."  In *Adland v. Russ*, the court conferred standing on a group of plaintiffs who challenged the placement of a Ten Commandments monument on the capitol grounds. *Adland v. Russ*, 307 F.3d 471 (6th Cir. 2002).  The court found that the fact that the plaintiffs "frequently travel[ed] to the State Capitol to engage in political advocacy for a variety of organizations and that they will endure direct and unwelcome contact with the Ten Commandments monument," was sufficient to meet the "injury-in-fact" requirement for standing. *Id*. at 478.  Contrary to what the dissent deems to be a mis-reading of the *Valley Forge* precedent, this circuit's elaboration of *Valley Forge* is consistent with both the principles established therein, and with the articulations of our sister circuits.  *See Murray v. Austin*, 947 F.2d 147, 151 (5th Cir. 1991); *ACLU v. St. James*,

---

307 F.3d at 478.  Standing for their co-Plaintiff, the American Civil Liberties Union, a voluntary membership organization, followed from their own standing under the test set out above. *Id*. at 478-79.

ACLU-Ohio has identified member Bernard Davis, a lawyer who travels to and must practice law within DeWeese's courtroom from time to time.  There, Davis has and would continue to come into direct, unwelcome contact with the Ten Commandments display, the removal of which would, no doubt, prevent further injury to him.  The interest protected by this challenge on his behalf is, no doubt, germane to the ACLU-Ohio's stated purpose, the preservation of the constitutional separation of church and state.  The declaratory and injunctive relief and attorneys fees sought in this matter would not require the direct participation of any ACLU-Ohio member.  It follows that the ACLU-Ohio has standing to assert the instant challenge to DeWeese's display.

## B.  THE *LEMON* TEST

The Establishment Clause of the First Amendment, made applicable to the states by the Fourteenth Amendment, states that "Congress shall make no law respecting an establishment of religion." U.S. CONST., amend. I; *Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947).  Thus, "[t]he Establishment Clause...prohibits government from appearing to take a position on questions of religious beliefs or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'"[4] *County of Allegheny*

---

794 F.2d 265, 268 (7th Cir. 1986); *Rabun County*, 698 F.2d 1098, 1108 (11th Cir. 1983).

[4]There is a "crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 302

*v. Am. Civil Liberties Union*, 492 U.S. 573, 593-94 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668 (1984)), *quoted in American Civil Liberties Union of Kentucky v. McCreary County, Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003). To determine whether a particular action by the government violates the Establishment Clause, we apply the test set forth in *Lemon v. Kurtzman*, asking (1) whether the challenged government action has secular purpose, (2) whether the action's primary effect advances or inhibits religion, and (3) whether the action fosters an excessive entanglement with religion.[5] *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971); *Adland,* 307 F.3d at 479.

### 1. PURPOSE

"Although a government's stated purposes for a challenged action are to be given some deference, it remains the task of the reviewing court to 'distinguis[h] a sham secular purpose from a sincere one.'" *McCreary County*, 354 F.3d at 446

---

(2000) (quoting *Board of Educ. of Westside Community Schools v. Mergens*, 496 U.S. 226, 250 (1990) (O'Connor, J., concurring) (emphasis in original)). DeWeese's posters are situated in a courtroom, a public space, and were placed on the wall by a sitting judge charged with the decoration of that space while in office and presiding in the same courtroom. As such, we reject Judge DeWeese's contention that the display constitutes private religious expression protected by the Free Speech Clause, falling beyond the bounds of Establishment Clause scrutiny. Indeed, they constitute government speech subject to the strictures of the Establishment Clause.

[5] Notwithstanding oft-aired criticism and debate about the *Lemon* test, sentiments shared and voiced in Appellant's brief, *Lemon* remains the law, providing the framework in Establishment Clause cases such as the instant matter and binding this intermediate federal court until such time as it is explicitly overruled or abandoned by the Supreme Court. *ACLU of Ohio v. Capital Square Review & Advisory Bd.*, 243 F.3d 289, 306 & n. 15 (6th Cir. 2001) (*en banc*); *Adland*, 307 F.3d at 479 (6th Cir. 2002) (citing *Grutter v. Bollinger*, 288 F.3d 732, 743) (6th Cir. 2002)).

(quoting *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 308 (2000)). Thus, a plaintiff must show that the predominate purpose for a challenged display is religious, although a totally secular purpose is not required. *Id.* (citing *Adland*, 307 F.3d at 480). At the end of the day, the display must not constitute a "purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message." *Id.* (quoting *Lynch,* 465 U.S. at 680).

"The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact[....,]" but the Supreme Court has established no *per se* rule that displaying the Ten Commandments in an public setting is unconstitutional. *Stone v. Graham*, 449 U.S. 39, 41-42 (1980); *see Edwards v. Aguillard*, 482 U.S. 578, 593-94 and 607-08 (Powell, J., concurring) (1987) . While not holding that all displays or uses of the Ten Commandments evinced a sectarian purpose, the Supreme Court has determined that, as a text:

> ...the Commandments do not confine themselves to arguably secular matters....Rather, the first part of the commandments concerns the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath day.

*Id.* at 41-42.

This is to say that, notwithstanding the contents of the text, it would be possible for a government actor to use the Decalogue in a constitutionally permissible manner where, for example, it is "integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Stone*, 449 U.S. at 42. *see Aguillard*, 482 U.S. at 594 ("[*Stone*] did not mean that no use could ever be made of the

Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization."). This was not the case in *Stone*, where the Supreme Court was faced with a Kentucky statute requiring that the Ten Commandments be posted in each classroom with a notation indicating the secular application of the Ten Commandments as it was incorporated into the "fundamental legal code of Western Civilization and the Common Law of the United States." *Stone v. Graham*, 449 U.S. 39, 41 (1980); *see Lynch*, 465 U.S. at 679 ("The Court [in *Stone*] carefully pointed out that the Commandments were posted purely as a religious admonition, not integrated into the school curriculum.").

Accordingly and considering the facts in the instant matter, we agree with the district court that DeWeese has not posted his display with a permissible secular purpose. DeWeese has testified that:

> My intent in posting these documents was to use them occasionally in educational efforts when community groups come to the courtroom and ask me to speak to them. These documents are useful in talking about the origins of law and legal philosophy and about the rule of law as opposed to the rule of man.

J.A. at 75. He continued, stating that he chose the Ten Commandments because they were emblematic of moral absolutism and that he chose them to express the belief that law comes either from God or man, and to express his belief that the law of God is the "ultimate authority." J.A. at 135-37. He explained that in the course of his educational efforts he would point to the Ten Commandments as an example of God as the ultimate authority in law. J.A. at 153.

As a result, the district court noted that DeWeese's purpose was:

> ...(1) to instruct individuals that our legal system is based on moral absolutes from divine law handed down by God through the Ten Commandments and (2) to help foster debate between the philosophical position of moral absolutism (as set forth in the Ten Commandments) and moral relativism in order to address what he perceives to be a moral crisis in this country.

*American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook*, 211 F.Supp.2d 873, 888 (N.D. Ohio 2002). The district court concluded that "[a] state actor officially sanctioning a view of moral absolutism in his courtroom *by particularly referring to the Ten Commandments* espouses an innately religious view and, thus, crosses the line created by the Establishment Clause." *Id.* at 889 (emphasis in original).

Despite his stated intent to use the display for educational purposes, DeWeese has not described a role for the Ten Commandments poster in his educational errand other than to admonish participants in talks or programs in his courtroom to look to the Commandments as a source of law. His own testimony belies the secular purpose he wishes to ascribe to it, and, as he acted alone in posting the display, his stated purpose for the display must guide the decision in this matter. Accordingly, we find that the district court properly applied the first prong of the *Lemon* test and did not misapply the teaching of *Stone v. Graham*, as Appellant contends. DeWeese wore his "heart" on his shirt sleeve during his deposition, and the district court properly relied upon his testimony when it determined that DeWeese's purpose in posting the Ten Commandments revealed a predominate non-secular purpose for the display. The display fails the first prong of the test and constitutes a violation of the Establishment Clause of the First Amendment.

## 2.   ENDORSEMENT

In order to ascertain the primary effect of the action under the second prong of the *Lemon* test, we apply the "endorsement" test, asking whether or not a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government. *Baker v. Adams County/Ohio Valley Sch. Bd.,* 310 F.3d 927, 929 (6th Cir. 2002); *Adland*, 307 F.3d at 479. We ask whether a reasonable observer "acquainted with the text,...history, and implementation" of DeWeese's display of the Ten Commandments in his courtroom would view it as a state endorsement of religion. *Santa Fe Indep., Sch. Dist.*, 530 U.S. at 308; *McCreary County*, 354 F.3d at 458. "[T]he inquiry must be viewed under the 'totality of the circumstances surrounding the display....[,]'" including the contents and the presentation of the display, because the effect of the government's use of religious symbolism depends on context. *McCreary County*, 354 F.3d at 458 (quoting *Books v. City of Elkhart, Indiana*, 235 F.3d 292, 304 (7th Cir. 2000)).

In identifying the appropriate context in which to consider a religious symbol, the Supreme Court has rejected expansive notions of context in decisions involving Christmas-time creche displays, demonstrating how the failure to integrate religious symbols with an overall secular theme can result in the endorsement of religion. *County of Allegheny*, 492 U.S. at 598. In *Allegheny*, the Supreme Court determined that secular holiday symbols located elsewhere in the courthouse and at a distance from what it deemed to be an impermissible creche display could not:

...negate the endorsement effect of the creche. The record demonstrates clearly that the creche, with its floral frame, was its own display distinct from any other decorations or exhibitions in the building.

*Id*. at 598, n. 48. It refused to equate this creche display with another located in the midst of contemporaneously erected secular holiday symbols.

In determining what constitutes a constitutionally permissible display of the Ten Commandments in a government building, the *McCreary County* court stated that "the symbols must be interconnected in a manner that is facially apparent to the observer[,] and...the interconnection must be secular in nature." *McCreary County*, 354 F.3d at 459. When secular and non-secular items are displayed together, we consider whether the secular image "detracts from the message of endorsement; [or if] rather, it specifically links religion ... and civil government." *Books,* 235 F.3d at 307. In the case of a single religious symbol or document placed alongside symbols of patriotic or political importance, it is understood that:

the reasonable observer will see one religious code placed alongside...political or patriotic documents, and will understand that the [government actor] promote[s] that one religious code as being on a par with our nation's most cherished secular symbols and documents. This is endorsement....

*American Civil Liberties Union of Kentucky v. McCreary County, Kentucky*, 145 F. Supp. 2d 845, 851 (E.D. Ky. 2001), *quoted in McCreary County*, 354 F.3d at 459.

Thus, this Court has condemned transparent attempts to "secularize" displays of the Ten Commandments by surrounding them with other patriotic documents and symbols. *McCreary County*, 354 F.3d at 460 (citing *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 773 (7th Cir.2001) (holding that a display consisting of Bill of Rights, Preamble to Indiana Constitution and Ten Commandments would signal to reasonable observer that "the state approved of such a link, and was sending a message of endorsement.")).

Similarly, the Seventh Circuit Court of Appeals found in *Books* that a Ten Commandments monument topped with an American eagle gripping the national colors had the impermissible effect of linking religion and civil government. *Books*, 235 F.3d at 304, cited in *McCreary County*, 354 F.3d at 460, and *Adland*, 307 F.3d at 486-87.

The Ten Commandments display in DeWeese's courtroom is certainly separate and distinct from the items contained in the Freedom Shrine in the adjacent lobby, notwithstanding his argument that one must pass through that lobby to reach his courtroom. Beyond noting the distance between the items in his courtroom and the items in the lobby, we note that the items in each display were posted at different times, by different parties, and are not even displayed in a similar aesthetic fashion. There has been no attempt, such as the posting of a sign, to create a connection between the two displays for observers. Similarly, the Ten Commandments display is divorced from the other items displayed in DeWeese's courtroom – the portrait of President Abraham Lincoln, posters extolling the jury system, the Ohio seal, and the Ohio state motto – each posted at different times, in different portions of the courtroom, by various parties, and without any apparent concern for their connection, aesthetic or otherwise, to the other items displayed. Any argument that DeWeese's display of the Ten Commandments must be considered in the context of these other items posted in the courthouse is contrived at best. The relative placement of the items simply does not suggest a cohesive display, theme, or secular message that could mitigate any message of endorsement on the part of DeWeese in posting the Ten Commandments in his courtroom.

Accordingly, we are left to consider the Ten Commandments display in context with DeWeese's Bill of Rights poster, contemporaneously created and placed on display by DeWeese. Demonstrating a unity of typeface, font size, and framing, these two items have been placed opposite

one another on otherwise blank walls in DeWeese's courtroom. Insofar as there is a cohesiveness suggesting a unified display, the Bill of Rights poster does nothing to negate the endorsement effect of the Ten Commandments poster, and the joint display affords Appellant no relief. DeWeese's display conveys a message of religious endorsement because of the complete lack of any analytical connection between the Ten Commandments and the Bill of Rights that could yield "a unifying historical or cultural theme that is also secular" for a reasonable observer. *McCreary County*, 354 F.3d at 460. The Bill of Rights is not only a cherished secular document – it is a legal document securing the rights of parties appearing in DeWeese's courtroom and binding DeWeese as a jurist. "The Ten Commandments are several thousands of years old, [are] not a product of ...American culture and, many believe, are the word of God." *Id.* They bind no jurist and are not "law" in any courtroom, notwithstanding any similarities or historical associations between the Decalogue and our Constitution, the Bill of Rights, statutes, and common law.

Thus, even though the Ten Commandments poster is posted opposite the Bill of Rights, a "reasonable person will think religion, not history." *Indiana Civil Liberties Union,* 259 F.3d at 773 (holding that reasonable observer would not be able to make an analytical connection between Ten Commandments, Bill of Rights and Preamble to Indiana Constitution), *cited in McCreary County*, 354 F.3d at 460. By placing the Decalogue in apparent equipoise with the Bill of Rights in this manner, DeWeese has created the effect of an endorsement of a particular religious code, vis à vis the Ten Commandments, by the government.[6] Thus, even had Appellant's non-secular purpose not been announced so clearly in his deposition testimony, we could still find that

---

[6] As noted earlier in this opinion, DeWeese's own testimony certainly suggests that he intended nothing less.

this particular display of the Ten Commandments constitutes an impermissible government endorsement of religion in violation of the Establishment Clause of the First Amendment. Nonetheless, as a government action "violates the Establishment Clause if it fails to satisfy any of [the *Lemon* test] prongs," we limit our holding under the *Lemon* test to the conclusion that the district court did not err in determining that DeWeese demonstrated a non-secular purpose in posting the Ten Commandments in his courtroom. *Aguillard*, 482 U.S. at 583; *McCreary County*, 354 F.3d at 462 (Gibbons, J., concurring).

## C.  HISTORICAL PRECEDENT AND CEREMONIAL DEISM

DeWeese proposes that his Ten Commandments poster should not be considered impermissible by virtue of *Lemon* analysis for it is supported by historical precedent. He suggests that it is similar to a constitutionally permissible invocation recited at the beginning of state legislative sessions, addressed in *Marsh v. Chambers* as "part of the fabric of our society." *Marsh v. Chambers*, 463 U.S. 783 (1983). While he argues that his poster is nothing more than a similar "tolerable acknowledgment of beliefs widely held among the people of this country....," his comparison is inappropriate as he has identified no long standing national practice or tradition of posting the Ten Commandments in county courthouses. *Id*. at 792.

Finally, DeWeese also relies heavily on the recent decision in *ACLU of Ohio v. Capitol Square Review & Advisory Board* to suggest that the Decalogue is more or less like the state motto of Ohio, "With God All Things Are Possible" because it does not "purport to compel belief or acquiescence....[,] command participation in any form of religious exercise....[,] assert a preference for one religious denomination or sect over others,...[or] involve the state in the governance of any church." *ACLU of Ohio v. Capitol Square Review &*

*Advisory Board*, 243 F.3d 289, 299-300 (6th Cir. 2001). The Sixth Circuit determined that:

> The motto is merely a broadly worded expression of a religious/philosophical sentiment that happens to be widely shared by the citizens of Ohio. As such, we believe, the motto fits comfortably within this country's long and deeply entrenched tradition of civic piety, or "ceremonial deism"...

*Id*. The same cannot be said of the Ten Commandments. As discussed in *Stone*, they necessarily serve as an admonishment to an observer because the first part of the commandments "concerns the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath day." *Stone*, 449 U.S. at 41-41. This prescriptive quality is distinct from the type of ceremonial deism described in *Capitol Square* and cannot redeem this display.

## IV.  CONCLUSION

For the reasons stated above, we find that Judge DeWeese's display of the Ten Commandments violates the Establishment Clause of the First Amendment. Accordingly, we **AFFIRM** the decision of the district court.

———————

**DISSENT**

———————

ALICE M. BATCHELDER, Circuit Judge, dissenting. I respectfully dissent. I question whether the ACLU has standing to bring this action, but certainly that issue is worthy of more discussion than the majority opinion devotes to it. Assuming that the ACLU does have standing, I disagree with the district court's and the majority's applications of the *Lemon* test. The facts of this case clearly indicate that Judge DeWeese's purpose in posting the Ten Commandments was sufficiently secular to survive this Establishment Clause challenge.

**I.**

I believe that the issue of standing is an open question, and one deserving of significant discussion. The majority is correct in noting that the ACLU, as a voluntary membership organization, has standing to bring a case by virtue of an alleged injury on behalf of one of its members. A voluntary membership organization has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm.*, 432 U.S. 333, 343 (1977); *see also Adland v. Russ*, 307 F.3d 471, 478 (2002). Assuming that the ACLU has properly brought the lawsuit to protect interests that are germane to its member Bernard Davis, the question remains whether Mr. Davis would have standing to sue in his own right. It appears to me that, under the plain holdings of the United States Supreme Court, he does not.

The ACLU and Davis have alleged no injury other than the "psychological consequence presumably produced by observation of conduct with which one disagrees" - an injury that the Supreme Court has specifically found insufficient to give standing under Article III. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982). Despite being "distinguished" by a number of district and circuit courts, *Valley Forge* remains good law, and has been cited by the Supreme Court more than three dozen times without so much as a hint of disapproval. The ACLU nonetheless relies upon several decisions of this Court that have found standing in similar circumstances. In my view, these cases can and should be distinguished from the present case.

In order to have standing under Article III, a party must show (1) an actual or threatened injury which is (2) fairly traceable to the challenged action, and (3) a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury. *Adland*, 307 F.3d at 477-78. The first prong of this test is most important for our purposes. In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Supreme Court elaborated on the actual injury requirement, stating that the injury must not only be alleged, but ultimately proven, and the injury must be "concrete" or "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 103.

In *Valley Forge*, the Supreme Court found insufficient injury to confer standing where plaintiffs "fail[ed] to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge*, 454 U.S. at 485. "That is *not* an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." *Id.* at 485-86 (emphasis added). This was plainly reiterated in *Steel Co.*, where the Supreme Court stated that

"psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co.*, 523 U.S. at 107. As Judge DeWeese quite aptly argued to this Court, the Supreme Court has not carved out any special exceptions to the rules governing standing for Establishment Clause claims.[1] "It does not become more palatable when the underlying merits concern the Establishment Clause." *Valley Forge*, 454 U.S. at 489. Various other federal courts, including this Court, have long attempted to redefine this rule by "distinguishing" the cases that come before them. The Supreme Court, however, has not merely failed to reverse *Valley Forge*, but in fact regularly cites it with approval.

The ACLU countered that this Court has held that in First Amendment, and especially Establishment Clause cases, the injury can be non-economic. In *Washegesic v. Bloomingdale Public Schools*, 33 F.3d 679 (6th Cir. 1994), a high school senior brought suit to remove a portrait of Christ from a hallway outside of the Bloomingdale Secondary School gymnasium. In cases such as this, we have held that "[t]he use of governmental authority to encourage a sectarian religious view is a sufficient injury if directed toward the plaintiff." *Id.* at 682. While abstract offense at a religious display may not be enough to confer standing, repeated

[1]Indeed, in *Valley Forge* the Supreme Court harshly criticized the Establishment Clause exceptions to the taxpayer-standing rules that had been read into the Court's decisions in *Frothingham v. Mellon*, 262 U.S. 447 (1923) and *Flast v. Cohen*, 292 U.S. 83 (1968). *See Valley Forge*, 454 U.S. at 484-85 n.20 ("Justice Brennan's dissent is premised on a revisionist reading of our precedents . . . . [T]he dissent must shoulder the burden of explaining why taxpayers with standing have no 'legal interest' in congressional expenditures except when it is possible to allege a violation of the Establishment Clause . . . . [B]oth claims have been rejected, precisely because Art. III requires a demonstration of redressable injury that is not satisfied by a claim that tax moneys have been spent unlawfully.")

"'unwelcome' direct contact with the offensive object" is. *Id.* (citation omitted). Because the plaintiff had "continuing direct contact with the object at issue," we found that his grievance was not "remote . . . or generalized as in *Valley Forge*." *Id.* at 683. The district court relied on both *Washegesic* and *Hawley v. City of Cleveland*, in which this Court found that the injury that conferred standing was the "impairment of [plaintiffs'] beneficial use of a public facility which they frequently use." *Hawley v. City of Cleveland*, 773 F.2d 736, 740 (6th Cir. 1985).[2] In *Hawley*, citizens challenged the lease of public space for a chapel at the Cleveland airport. Taxpayer standing was denied, but we found that plaintiffs had standing to sue for their actual injury when they used the airport. Similarly, in *Adland v. Russ* we found standing where individual plaintiffs frequently traveled to the Kentucky State Capitol to engage in political advocacy, and would endure unwelcome contact as a result of legislation proposing erection of a Ten Commandments monument there. *Adland*, 307 F.3d at 478.

I believe that the above cases are inconsistent with the holdings in *Valley Forge* and *Steel Co.*, and in that regard were wrongly decided.[3] Assuming *arguendo* that they were adequately distinguished from those Supreme Court cases, however, their rule is applicable to the present case only to

[2]Unlike the district court, the majority of this panel does not address the issue of "impairment of beneficial use of a public facility" at all.

[3]In addition to ignoring binding Supreme Court precedent, this Court has also at times disregarded even the most basic jurisdictional rules. In *Adland* we ruled on the constitutionality of a proposed historical and cultural display *that had not yet been erected*. In my view, the claim in *Adland* was not ripe for adjudication, and we therefore lacked subject matter jurisdiction. *Adland*, 307 F.3d at 490-91 (Batchelder, J., dissenting); *see Bigelow v. Mich. Dep't of Natural Res.*, 970 F.2d 154, 157 (6th Cir. 1992) ("If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed.").

the extent that this case too can be distinguished from the Supreme Court precedent. The present case is in fact much more easily differentiated from this Court's precedents than those of the Supreme Court. As I will discuss below, the posting of the Ten Commandments in Judge DeWeese's courtroom does not constitute the use of governmental authority to encourage a sectarian religious view, as did the portrait of Christ in *Washegesic*. It is either part of a display including nearly forty other posters and objects or, at a minimum, coexistent with the items in that display. It can, and does, serve a function other than encouraging a sectarian religious view. The portrait of Christ in *Washagesic* did not and, standing alone as it did, arguably could not serve another purpose. Importantly, the government action complained of in *Hawley*—the leasing of public space for a chapel—could also have served no purpose other than encouraging a sectarian religious view, and is therefore also easily distinguished from the present case. Even a cursory reading of the facts indicates that this case is quite dissimilar from *Washegesic* and *Hawley*.

*Adland* is the case most directly on point, and is also distinguishable. In that case, the Ten Commandments monument would have been part of a proposed historical and cultural display. The extent and contents of the display had not been made final, but the plan contemplated the inclusion of a series of unrelated objects, including—but not limited to—a large granite statue on which the Decalogue was posted; a memorial sign commemorating "A Civil War Reprisal"; a "Welcome to Kentucky" bronze plaque; the Kentucky Coffee Tree Marker commemorating author Joe Cross Creason; the Freedom Tree Marker memorializing Kentucky Vietnam Prisoners of War; a stone marker in memory of Charles Wickliffe; a plaque in memory of Governor Bert Combs; a memorial for John Stony Spicer; and Kentucky's Floral Clock, one of the largest such clocks in the world. *Adland*, 307 F.3d at 476-77. The Ten Commandments monument was to be the largest monument in the area, except for the Floral

Clock. The Resolution authorizing the display's creation specifically referenced the United States as a "Christian nation." *Id.* at 476. We held that the monument, as a part of this collection of seemingly unrelated objects, would not serve a secular purpose. *Id.* at 482-83.

In contrast to the proposed display in *Adland*, the Decalogue in Judge DeWeese's courtroom is not a large granite monument but a poster whose text is so small that it cannot be read from the jury box, the witness stand, or the bench. The poster is not surrounded by unrelated objects such as those found in *Adland*. Instead, the poster hangs in a courtroom that also displays a poster of the Bill of Rights; three framed posters of Jefferson, Hamilton, and Madison that praise the jury system; the seal of the State of Ohio and the state motto "With God All Things Are Possible"; a portrait of Lincoln; and the United States and Ohio state flags. Visitors to Judge DeWeese's courtroom also observe other documents and portrayals in the hall outside the courtroom. Judge DeWeese testified that he displayed these items so that he could use them in addressing community groups that come to the courtroom to learn about the origins of the law and legal philosophy.

I think it strains both logic and common sense to find that DeWeese's poster, like the stand-alone Christ portrait in *Washegesic*, constitutes "the use of governmental authority to encourage a sectarian religious view" that is "directed toward the plaintiff." *Washegesic*, 33 F.3d at 682. The portrait of Christ was prominent, conspicuous and unmistakably Christian in its message. In contrast, the poster at issue here is small, difficult to read from plaintiff's location in the courtroom, and — according to the *only* person who knows for sure—is not directed toward plaintiff but toward the educational efforts of the Judge when he is engaged by community groups. Nor does the presence of this poster constitute the kind of repeated "'unwelcome' *direct contact*

with the offensive object" that conferred standing in *Washegesic. See id.* (emphasis added).

It is somewhat instructive that the ACLU did not, in its initial filing, even allege a specific injury to one of its members. Rather, when later prompted to identify a member who was personally offended by the display, the ACLU produced an affidavit of one Bernard Davis, who claimed that the display offended him, diminished his enjoyment of a public facility, and made him feel as though a religious creed was being forced on him. Davis' claim is little more than a statement that he is offended by something a government representative is doing because he disagrees with it. This is explicitly the type of injury that the Supreme Court held insufficient to confer standing in *Valley Forge. See* 454 U.S. at 485-86. Furthermore, although it may be exactly what is required for standing under this Court's precedents, that is true only because it is a mere recitation of the language from applicable case law, utilized here to make out a colorable claim of standing. *See Washegesic*, 33 F.3d at 682; *Hawley*, 773 F.3d at 740.

In its efforts to gloss over Davis' lack of standing, and its own, the ACLU argued to the district court that the group "is a perennial litigant in Establishment Clause cases" and that "nothing about this suit [] requires the direct participation of ACLU members in this litigation." To the contrary, however, the Supreme Court has specifically rejected the idea that the Constitution permits federal courts to adjudicate claims brought by, as Judge DeWeese has called them, the "self-appointed Establishment Clause police":

> *Their claim* that the Government has violated the Establishment Clause *does not provide a special license to roam the country in search of governmental wrongdoing* and to reveal their discoveries in federal court. The federal courts were simply not constituted as ombudsmen of the general welfare.

*Valley Forge*, 454 U.S. at 487 (emphasis added). And yet, that is exactly what has occurred here. It is quite obvious from the filings that the ACLU in fact "roamed the country in search of wrongdoing," filed suit in the present case, and later, only after being prompted to do so, produced the affidavit of a member claiming to be offended by the display.

The tension between the cases cited by the district court and the plain statements of the Supreme Court is clear. Furthermore, the facts of the present case are distinguishable from those of the precedents cited by the district court. They are also distinguishable from a great many other "Ten Commandments" cases nationwide, which often involve facts much more similar to *Washegesic* or *Adland*. I do not agree with the majority that the facts of this case give the ACLU standing to pursue this claim. In any event, this issue was worthy of more discussion than the short shrift that it has received, both from the district court and the majority here today. Irrespective of standing, moreover, Judge DeWeese's display of the Ten Commandments in his courtroom—as part of an educational display also that also contained nearly forty other objects—plainly did not violate the Establishment Clause.

## II.

As an en banc panel of this Court recently stated in *ACLU v. Capitol Square Review and Advisory Board*, 243 F.3d 289 (6th Cir. 2001), the drafters of the Establishment Clause never intended to banish all mention of religion from the public square. "The provision was not understood as prohibiting the state from merely giving voice, in general terms, to religious sentiments widely shared by those of its citizens who profess a belief in God." *Id.* at 293. Indeed, as we also recognized, the Supreme Court has explicitly made this same point. "[T]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Id.* (quoting *Lynch v.*

*Donnelly*, 465 U.S. 668, 674 (1984)). As Judge DeWeese and amicus curiae Judge Randy T. Rogers pointed out at length in their briefs, and we discussed at length in *Capitol Square*, this nation's history is replete with examples of government actors expressing religious sentiments without offending the Constitution. *See id.* at 293-99.

The Supreme Court has developed a number of tests for evaluating the constitutionality of governmental action under the Establishment Clause. First is the so-called "*Lemon* test," from the Supreme Court's opinion in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). This test was itself modified by the "endorsement test" in *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984), which I use in analyzing this case under the *Lemon* test. Last is the "historical precedent test" from *Marsh v. Chambers*, 463 U.S. 783 (1983), which I will discuss separately.

### 1. The *Lemon* test

The *Lemon* test requires a court to determine (1) that the challenged government action has a secular purpose; (2) that the action's primary effect neither advances nor inhibits religion; and (3) that the action does not foster an excessive entanglement with religion. *Lemon*, 403 U.S. at 612-13. The government action "violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987). Plaintiffs have not made an excessive entanglement claim, so only the first two prongs are relevant to our analysis. Although the majority suggests that Judge DeWeese's display of the Ten Commandments could constitute an impermissible endorsement of religion, it affirms the district court based on the first prong of the analysis, and limits its holding to the conclusion that the district court did not err in determining that DeWeese demonstrated a non-secular purpose in posting the Ten Commandments in his courtroom. For the reasons discussed

below, however, I believe that Judge DeWeese's display survives both prongs of the *Lemon* analysis.

### A. Judge DeWeese's display of the Decalogue had a secular purpose

In my view, the district court committed reversible error in finding that the display did not have a secular purpose. The Supreme Court has stated that the first prong of *Lemon* may be satisfied if "a" secular purpose can be articulated. "The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but *only* when it has concluded there was no question that the statute or activity was motivated *wholly* by religious considerations." *Lynch*, 465 U.S. at 680 (emphasis added). In addition to the procedural requirement that the district court view factual evidence in the light most favorable to the non-moving party, this Court has held that "the government's assertion of a legitimate secular purpose is entitled to deference." *Brooks v. City of Oak Ridge*, 222 F.3d 259, 265 (6th Cir. 2000); *Chaudhuri v. Tennessee*, 130 F.3d 232, 236 (6th Cir. 1997). The district court should defer to the government's assertion of a legitimate secular purpose unless the assertion is a "sham." *Chaudhuri*, 130 F.3d at 236. In the absence of clear evidence to the contrary, Judge DeWeese's stated reason should stand. *See Lynch*, 465 U.S. at 680.

In contrast to the majority opinion, which today holds that Judge DeWeese's stated objective in putting up the display was a "sham" that constituted a "purposeful or surreptitious effort to express [] governmental advocacy of a particular religious message," I do not believe that a court viewing the factual evidence in the light most favorable to DeWeese (remembering that this matter was before the district court on motion for summary judgment) could have concluded that his posting of the Ten Commandments was motivated wholly, or even predominantly, by religious considerations. The only competent evidence as to DeWeese's purpose is his own

assertion, in his affidavit, that his "intent in posting these documents was to use them occasionally in educational efforts when community groups come to the courtroom and ask [him] to speak to them." This is not a statement of religious consideration, and there is nothing unconstitutional about it.

The ACLU asserted—and both the district court and the majority opinion today have found— that Judge DeWeese's stated purpose is a sham and that he has an ulterior purpose that is predominantly religious in nature. The district court rejected DeWeese's proffered motive for two reasons. First, the court relied heavily upon selected quotes from *Stone v. Graham*, 449 U.S. 39 (1980), to find a presumption against a secular purpose in Ten Commandments cases. Second, the court carefully parsed statements in DeWeese's deposition testimony concerning *his privately-held beliefs* to divine an additional, unstated religious purpose for the display that is not apparent from the testimony taken as a whole. The majority opinion summarily adopts these errors.

In *Stone* the Supreme Court was faced with a Kentucky statute that required the Ten Commandments to be posted in each classroom. The Court invalidated the statute, noting in the process that "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." 449 U.S. at 42. From this statement the district court concluded that "[g]iven the religious significance of the text of the Ten Commandments, their display may be considered constitutional where, but only where, a state or governmental body attempts to and does dilute the religious aspect of the display in favor of a secular message or purpose." *ACLU of Ohio Found., Inc. v. Ashbrook*, 211 F. Supp. 2d 873, 884 (2002).

It is clear that the district court's conclusion is not required by *Stone*. First, a finding that the Decalogue necessarily has

some religious purpose is not the same as a finding that the Decalogue serves a wholly religious purpose, the finding upon which a violation of the first prong of the *Lemon* test must rest. *See Lynch*, 465 U.S. at 680. As the Supreme Court later clarified, the Ten Commandments can serve both religious and secular purposes. "[*Stone*] did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization." *Aguillard*, 482 U.S. at 593-94. Even the *Stone* court itself noted that the Decalogue could be "integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization . . . or the like." *Stone*, 449 U.S. at 42. Those are precisely the kinds of activities, albeit not within the physical confines of a school, for which DeWeese uses the display when talking to community groups about the origins of the law and legal philosophy. The district court's interpretation of *Stone* is flawed, and its conclusion that the Decalogue's display is only constitutional where "diluted" directly conflicts with the Supreme Court's interpretation of *Lemon* in *Lynch*. A secular purpose need not be the only purpose, nor even the primary one. It simply must be *a* purpose which prevents the display from being motivated *wholly* by religious considerations. *Lynch*, 465 U.S. at 680.

Judge DeWeese has stated his purpose for the display, and he has suggested *only* the educational purposes for the display that have been explicitly endorsed by the Supreme Court. The ACLU has presented portions of DeWeese's deposition testimony as evidence that "DeWeese did not have a purely secular philosophical purpose in displaying the Commandments in his courtroom, nor a strictly secular understanding of the meaning of their display." But it is patently unnecessary for DeWeese to have had a purely secular purpose. He merely needed not to have a purely religious purpose. The majority circumvents this principle by relying on this Court's decision in *ACLU of Kentucky v.*

*McCreary County*, 354 F.3d 438, 446 (2003), for the erroneous proposition that DeWeese's display should be found unconstitutional if the ACLU can "show that the predominate [sic] purpose for a challenged display is religious." That is also an erroneous statement of the proper standard. The Supreme Court has spoken clearly on this issue, and it is not the prerogative of this Court to continue to chip away at the proper analysis by applying selective readings of only those precedents with which we agree.

Even applying *McCreary County*'s erroneous "predominate [sic] purpose" standard, however, DeWeese's display easily passes muster. Although DeWeese concedes that the Commandments are emblematic of moral absolutes, and that "there are limits in the philosophy of law beyond which people are not permitted to go," there is nothing in his testimony that can be fairly construed as proving that his purpose was predominantly religious. Judge DeWeese specifically stated that he put up the display "as a matter of jurisprudence and legal philosophy"—some of the specific matters that he discusses in his educational talks with community groups. Nonetheless, the district court and the majority opinion today have relied on DeWeese's deposition testimony to conclude that DeWeese's purpose was:

> (1) to instruct individuals that our legal system is based on moral absolutes from divine law handed down by God through the Ten Commandments and (2) to help foster debate between the philosophical positions of moral absolutism (as set forth in the Ten Commandments) and moral relativism in order to address what he perceives to be a moral crisis in this country.

*Ashbrook*, 211 F. Supp. 2d at 888.

Having read DeWeese's deposition, I believe this pronouncement appreciably overstates his testimony, and in fact blurs the distinction between his personal beliefs and his

motives for the display. Even if this were a correct reading of DeWeese's testimony, however, it would merely demonstrate that one of his purposes was religious. It proves neither that DeWeese did not have a secular purpose nor that his stated secular purpose was not the predominant purpose for the display. Nor do I agree with the majority's incredible assumption that fostering debate between the philosophical positions of moral absolutism and moral relativism "crosses the line created by the Establishment Clause." A great many state educational institutions will be shocked, I suspect, to learn that fostering debate between philosophical positions is now unconstitutional in the Sixth Circuit.

The majority opinion finds that DeWeese has described no role for the Ten Commandments poster in his educational errand other than as an admonition that listeners or participants in his programs look to them as a source of law. In my view, the majority seriously errs in its apparent assumption that the Constitution forbids all governmental recognition of the Decalogue's important historical role in the development of Western and American law and legal philosophy.

The district court erred in finding that there was no secular purpose for DeWeese's posting of the Ten Commandments in his courtroom. The court was required to view factual evidence in the light most favorable to DeWeese, as well as to show substantial deference to DeWeese's assertion that he had a legitimate secular purpose for the display. It did neither of these things. The majority opinion's subsequent determination that DeWeese's assertion of secular purpose was a "sham" also evinces a failure to show the proper deference to that assertion. Like the court in *McCreary County*, 354 F.3d at 446, the majority today imposes a higher bar than that either required or permitted by the Supreme Court, and demands either an entirely secular purpose or a primarily secular purpose for the display, where as a matter of law only an ascertainable secular purpose is required. *Lynch*,

465 U.S. at 680. The district court's finding that DeWeese's actions lacked a secular purpose should be reversed.

### B. A reasonable observer would not deem the display to be an endorsement of religion

In evaluating the "effects" prong of the *Lemon* test, I apply the "endorsement test" first explicated by Justice O'Connor in her concurring opinion in *Lynch*, 465 U.S. at 690, and later embraced by the Supreme Court's decision in *County of Allegheny v. ACLU*, 492 U.S. 573 (1989). As we have noted, the key question is "whether a reasonable observer would conclude that the government endorses religion" by allowing the challenged practice. *Hawley*, 24 F.3d at 822; *see Allegheny*, 492 U.S. at 592-94. Endorsement is to be judged by a "reasonable observer" standard, and the reasonable observer is deemed to be aware of the history and context of the community and forum in which the religious display appears. *See Capitol Square Review and Advisory Board v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring) [hereinafter "*Pinette*"]. While there is always someone who might perceive a particular action as an endorsement of religion, that person does not personify the reasonable observer. "A State has not made religion relevant to standing in the political community simply because a particular viewer of a display might feel uncomfortable." *Id.*

The endorsement test is a fact-intensive inquiry that requires us to analyze fully the nature of the display and its relationship to the surrounding displays. DeWeese has argued that the totality of the circumstances surrounding the display at issue here would not lead a reasonable observer to conclude that the presence of the Ten Commandments in his courtroom constitutes government endorsement of religion. The Ten Commandments themselves are printed on a poster that Judge DeWeese hung in the spectator section of his courtroom. The Bill of Rights is found on an identical poster, hung on the opposite wall of that area of the courtroom. The text of these

posters is too small to be read from the jury box, the witness stand, or the bench. At the top of each of the posters, in much larger type than the main text, appears the legend: "the rule of law." Also hanging in the spectator section of the courtroom are three framed posters in which Jefferson, Hamilton, and Madison praise the jury trial system. In front of the bar, flanking the judge's bench, are the United States and Ohio state flags. A portrait of Lincoln hangs on one side of the bench. Directly behind the bench and above the judge's chair is the seal of the State of Ohio, with a ribbon-like device bearing the words of Ohio's motto: "With God All Things Are Possible."

Visitors arriving at Judge DeWeese's courtroom no doubt observe in the hall outside the courtroom the "Freedom Shrine," donated by the Exchange Club of Mansfield "to strengthen citizen appreciation of our American heritage." This "Shrine" displays the texts or excerpts from more than two dozen noteworthy orations in American history, including various Presidents' inaugural addresses. At least half of these texts contain explicit references to the connection between religion and civic order. *See, e.g.*, John F. Kennedy's Inaugural Address ("And yet the same revolutionary beliefs for which our forbears fought are still at issue around the globe - the belief that the rights of man come not from the generosity of the state, but from the hand of God."). Except for the posters of the Decalogue and the Bill of Rights, all of the display (or displays, if, like plaintiffs, one believes the courtroom display is completely separate from the lobby display) was in the courtroom, hallway, and lobby in the fall of 2000. DeWeese added these posters at that time, for the purpose of using them in conjunction with the other items in the display in his educational efforts when community groups come to the courtroom.

The district court went to great lengths to demonstrate that the poster of the Decalogue was "prominent and relatively isolated," and concluded that because the "Freedom Shrine"

and the portrayals inside the courtroom were erected at different times and are geographically distinct, there is no cohesive display, theme, or secular message. *Ashbrook*, 211 F. Supp. 2d at 892. The majority opinion adopts this flawed reasoning. It is certainly true that the Decalogue poster appears on the wall by itself; however, focusing on this fact ignores the overall context in which the poster appears. As DeWeese argued in his brief, "no one is simply 'beamed up' into DeWeese's courtroom; visitors must pass by the Freedom Shrine in order to get there." In reviewing Establishment Clause challenges, courts have employed much more expansive contexts than the two-room context urged here by DeWeese. *See Books v. City of Elkhart*, 235 F.3d 292 (7th Cir. 2000), *cert. denied*, 121 S. Ct. 2209 (2001) (context considered was the entire lawn of Elkhart city building, including Decalogue monument and two other monuments, all of which had been placed at different times); *State v. Freedom from Religion Found*, 898 P.2d 1013 (Colo. 1995), *cert. denied*, 516 U.S. 1111 (context considered sprawled over three blocks).

Taken as a part of the larger display both within the courtroom and extending into the hallway and lobby, the Decalogue poster is merely one part of a forty-piece display that "signal[s] respect not for great proselytizers but for great lawgivers." *See ACLU of Kentucky v. McCreary County*, 145 F. Supp. 2d 845, 853 (E.D. Ky. 2001) (quotation omitted). The majority ignores DeWeese's stated purpose for the display and suggests that it is a "transparent attempt" to "secularize" a display of the Ten Commandments. I have seen no evidence that this is the case, and I believe that Judge DeWeese presented the Ten Commandments objectively and integrated them with a secular message. *See McCreary County*, 354 F.3d 449. Even if we were to exclude the Freedom Shrine, I believe that the ten-object display within the courtroom itself provides sufficient context for the poster.

While there will always be someone, such as Bernard Davis, who might perceive a particular action as an endorsement of religion and lacking any secular purpose, that person does not personify the reasonable observer. *See Pinette*, 515 U.S. at 780. To the contrary, "[the] proper application of First Amendment principles demands a sense of proportion." *Van Orden v. Perry*, 351 F.3d 173, 178 (5th Cir. 2003). In *Lynch*, the Supreme Court upheld Pawtucket, Rhode Island's display of a purely religious symbol—a creche—against an Establishment Clause challenge. The majority found that the district court erred in holding that the inclusion of a creche in an overall Christmas display had no secular purpose. *Lynch*, 465 U.S. at 680. The Court further rejected the contention that the primary effect of the creche was to confer a substantial and impermissible benefit on religion. *Id.* at 681-82. In her concurrence, Justice O'Connor developed the endorsement test and found "clearly erroneous" the district court's holding that "the city's use of an unarguably religious symbol 'raises an inference' of intent to endorse." *Id.* at 691. Even though the sectarian significance of the creche was *not* neutralized by the setting, the composition of the overall display made the government's use of the creche no more an endorsement of religion than such acknowledgments of religion as legislative prayers or the opening of court sessions with "God save the United States and this honorable court." *Id.* at 693.

The majority relies on portions of *Allegheny* for the proposition that the Supreme Court has rejected expansive notions of context when analyzing displays challenged under the Establishment Clause. Although the *Allegheny* Court invalidated the government's display of a creche on a courthouse staircase, the circumstances surrounding that display were completely dissimilar from those of the present case. Secular holiday symbols were located in other parts of the building, but the creche—a purely religious symbol—was alone on the staircase. In this case, the Ten Commandments—a religious text that may also have a

secular purpose within a larger display—is posted in a room with nine other objects that share some relation.

Importantly, the *Allegheny* Court decided a second case, not discussed by the majority opinion, that seems more applicable to the facts before us now. The Court allowed the public display of a menorah as part of a larger "Salute to Liberty" display. *See Allegheny*, 492 U.S. at 582. The Court specifically noted that the menorah had both religious and secular aspects: "The menorah, one must recognize, is a religious symbol . . . But the menorah's message is not exclusively religious." *Id.* at 613. In the present case, the Ten Commandments were posted in a room with nine other depictions related to law and government, and were used by DeWeese as part of his educational presentations. The reasonable observer defined by the Supreme Court would not conclude that DeWeese's inclusion of the Decalogue in a display that also includes the Bill of Rights, a portrait of Abraham Lincoln, accolades to the jury system, the Great Seal of Ohio, and the items comprising the Freedom Shrine, constitutes the government's endorsement of religion. "To say otherwise retreats from the objective test of an informed person to the heckler's veto of the unreasonable or ill-informed—replacing the sense of proportion and fit with uncompromising rigidity at a costly price to the values of the First Amendment." *Van Orden*, 351 F.3d at 182.

### 2. *Marsh* and "Historical Precedent"

The majority opinion also rejects DeWeese's contention that his posting of the Ten Commandments is similar to the constitutionally permissible invocation addressed in *Marsh v. Chambers*, 463 U.S. 783 (1983). In that case the Supreme Court upheld the Nebraska legislature's practice of opening each legislative day with a prayer by a chaplain paid by the state. The *Marsh* Court simply ignored the *Lemon* test, finding that "[i]n light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the

practice of opening legislative sessions with prayer has become part of the fabric of our society." *Id.* at 792. The Court described the practice as "simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id.*

The majority finds that this type of comparison is inappropriate because DeWeese "has identified no long standing national practice or tradition of posting the Ten Commandments in county courthouses." But DeWeese is clearly correct in arguing that government acknowledgment of the important foundational role of the Ten Commandments is indeed part of the fabric of our society. DeWeese pointed us to a multitude of depictions of the Decalogue found in our public buildings, including the United States Supreme Court, which itself has no fewer than three depictions of Moses and/or the Ten Commandments; the U.S. Capitol; various state capitols; and numerous federal courthouses. This includes, ironically, the district courthouse in Cleveland where this case was decided, which is adorned with a large, magnificent mural of the Ten Commandments flanked by angels.

DeWeese's position is also reinforced by the proliferation of lawsuits exactly like this one— at least a dozen of which have been decided in the past five years. *See, e.g.*, *McCreary*, 354 F.3d 438; *Freethought Society v. Chester County*, 334 F.3d 247 (3d Cir. 2003); *Turner v. Habersham County*, 290 F. Supp. 2d 1362 (N.D. Ga., 2003); *ACLU v. Mercer County*, 219 F. Supp. 2d 777 (E.D. Ky., 2002); *ACLU of Tenn. v. Rutherford County*, 219 F. Supp. 2d 799 (M.D. Tenn., 2002); *ACLU of Tenn. v. Hamilton County*, 202 F. Supp. 2d 757 (E.D. Tenn., 2002); *Kimbley v. Lawrence County*, 119 F. Supp. 2d 856 (S.D. Ind., 2000); *Suhre v. Haywood County*, 55 F. Supp. 2d 384 (W.D. N.C., 1999). This may not prove that there is a tradition of posting the Decalogue in county courthouses, but it certainly counsels against the majority's dismissive attitude toward DeWeese's "historical precedent"

argument. Nor am I convinced that such an analysis should be limited merely to county courthouses, as opposed to all courthouses, or government buildings in general.

The majority makes what is, at best, an unconvincing attempt to distinguish between the present case and our holding in *Capitol Square*, where we noted that the state motto of Ohio, "With God All Things Are Possible," does not "purport to compel belief or acquiescence . . . . [,] command participation in any form of religious exercise . . . . [,] assert a preference for one religious denomination or sect over others, . . . [or] involve the state in the governance of any church." *Capitol Square*, 243 F.3d at 299-300. Judge DeWeese's display does none of these things either, despite the majority opinion's claim that the Decalogue serves as an admonishment to observers because the first part of the Commandments concerns only the religious duties of believers.

No one can seriously oppugn the importance of the Ten Commandments in the development of the law in our secular society. Whether palatable to plaintiffs or not, "[i]nnumerable civil regulations enforce conduct which harmonizes with religious canons. State prohibitions . . . reinforce commands of the decalogue." *McGowan v. Maryland*, 366 U.S. 420, 462 (1961) (Frankfurter, J., concurring). As a historical matter, this has been true of all of the Commandments and not, as the majority seems to imply, merely the latter ones. Consider, for example, the myriad of states' "Blue Laws" or "Sunday Closing Laws" that have their roots in the Decalogue's command to "remember the Sabbath day, to keep it holy." The Supreme Court has even upheld such laws despite recognizing their original purpose. *See id.* at 446 (noting that the predecessors of modern Sunday laws "are undeniably religious in origin").

The Commandment against "using the Lord's name in vain" is still applied in daily secular life, most notably where

witnesses and government officials swear to tell the truth or uphold the law "so help me God." In any event, that Commandment played an undeniable role in early American law, which even included prohibitions against, and prosecutions for, the crime of blasphemy. *See, e.g.*, *State v. Chandler*, 2 Del. (2 Harr.) 553 (Del. 1837) (affirming defendant's conviction for blasphemy); *People v. Ruggles*, 8 Johns. 290, 293 (N.Y. 1811) (same). Nor can one discount even the Commandment against worshipping idols, which was offered in the Revolutionary era as a reason for fighting the British monarchy. *See* THOMAS PAINE, COMMON SENSE 73 (Isaac Kramnick ed., Penguin Books 1976) ("And when a man seriously reflects on the idolatrous homage which is paid to the persons of the Kings, he need not wonder that the Almighty . . . should disapprove a form of government which so impiously invades the prerogative of heaven.").

As a historical matter, the *Stone* Court's oft-repeated truism that the first three or four Commandments are "exclusively religious" is simply not true. Including these rules as part of a historical display about the development of American law is accurate, appropriate, and, until today, legally permissible.

### III.

Judge DeWeese began his brief by pointing out the absurdity of this case, wherein a federal judge, sitting beneath "a magnificent mural of the Ten Commandments flanked by two angels," has ordered a state judge to remove from *his* courtroom a poster containing the plain text of the same Ten Commandments. The ACLU responded that this was a mere "ironic curiosity," and nothing more. Indeed, the ACLU argued that "[t]he courts speak through their journals, and not their frescos. Their judgments are recorded in the [] reporters, and not on their walls." In the latter observation, the ACLU is entirely correct. The irony lies in the fact that the ACLU does not dispute that DeWeese, in resolving the cases that come before him and whose judgments are entered in the

reporters, does not use and has not used these documents. *Ashbrook*, 211 F. Supp. 2d at 888.

As Justice Thomas has so aptly noted:

For nearly half a century, [the Supreme] Court has extended First Amendment protection to a multitude of forms of "speech," such as making false defamatory statements, filing lawsuits, dancing nude, exhibiting drive-in movies with nudity, burning flags, and wearing military uniforms . . . . [T]he Courts of Appeals have [] concluded that the First Amendment protects, for example, begging, shouting obscenities, erecting tables on a sidewalk, and refusing to wear a necktie.

*Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 411-12 (2000) (Thomas, J., dissenting). But the majority opinion holds today that that same First Amendment does not protect the posting, in a historical display used for educational purposes, of a set of rules that has played an undeniable role in the formation of this nation's laws.

I cannot join the majority in finding that the Establishment Clause is so inelastic as to not "permit[] government some latitude in recognizing and accommodating the central role religion plays in our society." *Allegheny*, 492 U.S. at 657 (Kennedy, J., concurring in part and dissenting in part) (citing *Lynch*, 465 U.S. at 678)). In the matter before us, Judge DeWeese displayed a small, unobtrusive copy of the Ten Commandments in his courtroom, as part of a series of documents and depictions that he uses for the express purpose of educating community groups on the history and philosophy of the law. It is not unconstitutional to make observations of historical fact. As Justice Goldberg wisely reminded us more than four decades ago, "[n]either government nor this Court can or should ignore the significance of the fact that . . . many of our legal, political and personal values derive historically from religious teachings." *School Dist. of Abington Township*

*v. Schempp*, 374 U.S. 203, 306 (1962) (Goldberg, J., concurring). It seems to me that the majority today does exactly that.

I respectfully dissent.